## UNITED STATES *v.* WINANS.·

### APPEAL FROM THE CIRCUIT.COURT OF THE UNITED STATES FOR THE DISTRICT OF WASHINGTON.

No. 180.   Argued April 3, 4, 1905.—Decided May 15, 1905.

This court will construe a treaty with Indians as they understood it and as justice and reason demand.

The right of taking fish at all usual and accustomed places in common with the citizens' of the Territory of Washington and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians in the treaty of 1859, was not a grant of right to the Indians but a reservation by the Indians of rights already possessed and not granted away by them.   The rights so reserved imposed a servitude on the entire land relinquished to the United States under the treaty and which, as was intended to be, was continuing against the United States and its grantees as well as against the State and its grantees.

The United States has power to create rights appropriate to the object for which it holds territory while preparing the way for future States to be carved therefrom and admitted to the Union; securing the right to the Indians to fish is appropriate to such object, and after its admission to the Union the State cannot disregard the right so secured on the ground of · its equal footing with the original States.

Patents granted by the United States for lands in Washington along the Columbia River and by the State for lands under the water thereof and rights given by the State to use fishing wheels are subject to such reasonable regulations as will secure to the Yakima Indians the fishery rights reserved by the treaty of 1859.

THE facts are stated in the opinion.

*The Solicitor General* for the United States:

The fishery involved is and always has been a famous one. · It is a "usual and accustomed place" and one of the best, if not ·the best place, on the Columbia River.   The Yakima Indians. have resorted to it above all others and depended on it for the supply of fish which was their steady subsistence.   The treaty· was negotiated with distinct recognition of this right.

The Indians objected to the transfer of their lands until assured by the Government as to the fishery rights.

Fish wheels are very destructive. They catch salmon by the ton, are not only rapidly diminishing the supply but will soon totally destroy it. But whether or not the wheels are unjustifiable *per se* and should be removed on the Indian's complaint, their grievance is greater; they are not allowed to fish at all. They do not claim exclusive rights, but rights in common with citizens. The defendants claim exclusive rights, and that if the Indians can fish at all, they must do so at other points along this stretch as these lands have been patented, and are owned by the defendants. The Indians cannot cross the lands to reach the fishery and are without any right whatever except what the defendants allow as a matter of grace. They are allowed no real rights.

The Government has always striven against disparity between our promises when obtaining treaties and the actual meaning of the instrument as it is sought to be construed when the greed of white settlers is aroused. The treaty involved was not merely one of peace and amity, or of "friendship, limits and accommodation," but a treaty of cession of lands by accurate description and on considerations duly expressed, one of which was the fishery rights now contended for.

As to the spirit in which Indian treaties should be construed see *Worcester* v. *Georgia*, 6 Pet. 515, 581; *Fletcher* v. *Peck*, 6 Cr. 87; *Johnson* v. *McIntosh*, 8 Wheat. 543; *Cherokee Nation* v. *Georgia*, 5 Pet. 1; *United States* v. *Cook*, 19 Wall. 591; *Choctaw Nation* v. *United States*, 119 U. S. 1.

Defendants' title rests on patents and on contracts with the State of Washington. Before they acquired title they knew of the Indian claims. There was always notice and actual knowledge by reason of the treaty provisions, by reason of the notorious Indian use of this fishery. The patents never gave absolute title, and the fee was always conditional. The treaty gave the right. Congress has never divested the Indians

of the right. An executive officer mistakenly issuing a patent without proper reservations under such circumstances cannot thus divest valid vested rights.

This is an old controversy, and has been fully adjudicated in favor of the Indians by the Washington courts. *United States* v. *Taylor*, 3 Wash. Ty. 88. And, this adjudication has been recognized by the Federal courts. *United States* v. *Taylor*, 44 Fed. Rep. 2. *Alaska Packers' Assn. case*, 79 Fed. Rep. 152, was against us on the ground that the private title and the operation of fish traps under state licenses necessarily confer exclusive rights. *The James G. Swan*, 50 Fed. Rep. 108, distinguished. We are not seeking to impress a broad and vague servitude on all patented lands along the Columbia, but only a clear and limited one on this particular small tract. Under English and American rules exclusive rights to fisheries are not favored. 2 Bl. Com. 39, 40, 417 *et seq.; Weston* v. *Sampson*, 8 Cush. 346, 352; *Carson* v. *Blazer*, 2 Bin. 475; *Yard* v. *Carman*, 2 Pen. (N. J.) 681, 686; *Melvin* v. *Whiting*, 7 Pick. 79; 1 Pingrey on Real Property, 107, 108; Washburn on Easements and Servitudes, 533; *Shrunk* v. *Schuylkill Navigation Co.*, 14 S. & R. 71; *Bickel* v. *Polk*, 5 Harr. (Del.) 325; *Hogg* v. *Beerman*, 41 Ohio St. 81; *Sloan* v. *Biemiller*, 34 Ohio St. 492. So far as the right may be exclusive, belonging to the riparian owner (in non-navigable waters), the State may restrain and regulate. *Waters* v. *Lilley*, 4 Pick. 145; *Commonwealth* v. *Chapin*, 5 Pick. 199. In either aspect, viz.: of a common right or one incident to dominion of the soil, the Indian claim here is good, because it was shared with citizens and was recognized by the Government in respect to its public dominion and title long before the private grants by patent were made. The States control navigable waters, including the soil under them and the fisheries within their limits, subject only to the rights of the General Government under the Constitution in the regulation of commerce. *Smith* v. *Maryland*, 18 How. 71; *Manchester* v. *Massachusetts*, 139 U. S. 240; *Shively* v. *Bowlby*, 152 U. S. 1; *Martin* v. *Waddell*,

16 Pet. 367; *McCready* v. *Virginia*, 94 U. S. 391. *Eisenbach* v. *Hatfield*, 2 Washington, 236, shows how the courts of the State of Washington construe the scope of state control. But nevertheless the state power here is subject to fundamental limitation, viz.: the organic acts affecting Washington as a Territory and a State. Act of August 14, 1848, 9 Stat. 323; act of March 2, 1853, 10 Stat. 172; act of February 2, 1889, 25 Stat. 676; and the constitution of the State of Washington, Arts. XVII, XXVI, taken together and construed in the light of the principle established in *Shively* v. *Bowlby*, *supra*, mean that the state right and claim to control, as by the sale of shore lands and the issue of licenses for fish wheels, are subject to all rights granted or reserved when the Federal power was in full control, during the territorial status. This doctrine embraces the grant or reservation to the Indians of these fishery rights assured by the United States under treaty stipulations, soon after that region passed from the Indian country status into the territorial condition and long before it became a State.

The Indian claim is not merely meritorious and equitable; it is an immemorial right like a ripened prescription. *Barker* v. *Harvey*, 181 U. S. 481, distinguished. A mistake in fact was made in issuing the patents, but the ground of equitable intervention is not technically that of mistake or fraud, nor does the Government endeavor, contrary to statutory limitations, to vacate and annul patents, *e. g.*, act of March 3, 1891, 26 Stat. 1093, to set aside and cancel a patent on the ground of mistake or fraud. The court will recognize the justice of the Indian claim and declare and establish by its equity powers the trust for the Indians which at all times has been an essential ingredient of private title to these lands. A patent does not invariably and inevitably convey an absolute title beyond all inquiry and free of every condition. *Eldridge* v. *Trezevant*, 160 U. S. 452. See also *Ruch* v. *New Orleans*, 43 La. Ann. 275; *Barney* v. *Keokuk*, 94 U. S. 324; *Packer* v. *Bird*, 137 U. S. 372; *Shively* v. *Bowlby*, 152 U. S. 1.

*Ward* v. *Race Horse*, 163 U. S. 504, recognized, as if it fore-saw this case, the doctrine for which we are contending.

A decree for appellants must consider the reasonable rights of both parties; restricting the fish wheels if they can be maintained at all, as to their number, method and daily hours of operation. Nor can the Indians claim an exclusive right, and it may be just to restrict them in reasonable ways as to times and modes of access to the property and their hours for fishing. But, by some proper route, following the old trails, and at proper hours, with due protection for the defendants' buildings, stock and crops, free ingress to and egress from the fishing grounds should be open to the Indians, and be kept open.

*Mr. Charles H. Carey,* with whom *Mr. Franklin P. Mays* was on the brief, for respondents:

Upon the acquisition of the original Oregon Territory now including Oregon, Washington, and parts of other States, the United States became invested with the fee of all the lands and waters included therein. The "Indian title" as against the United States was merely a right to perpetual occupancy of the land, with the privilege of using it as the Indians saw fit, until such right of occupancy had been surrendered to the Government; and the Indian title to the reservations was of no higher character. *United States* v. *Alaska Packers' Assn.,* 79 Fed. Rep. 157; *Spalding* v. *Chandler,* 160 U. S. 394, 407.

The Indian title, even to the lands included in their reservation, is subject to the paramount control and power of Congress in the enactment of laws for the sale and disposal of the public lands. Cases *supra* and *Missouri, K. & T. Ry. Co.* v. *Roberts,* 152 U. S. 114.

Under the treaty of 1859, the Indians neither reserved nor did they acquire a title by occupancy to the lands bordering their usual and customary fishing grounds. They acquired merely an executory license or privilege, applying to no certain and defined places, and revocable at will of the United

States, to fish, hunt, and build temporary houses upon public lands, in common with white citizens, upon whom the law has conferred no title by occupancy whatever.  Cases *supra* and *Ward* v. *Race Horse*, 163 U. S. 504.

The treaty of 1859 imposed no restraint upon the power of the United States to sell the lands in controversy, and such a sale under the settled policy of the Government, was a result naturally to come from the advance of the white settlements along the river, and it cannot be assumed that the Government intended by general expressions in the treaty to tie up the development of the fishing industry through a long stretch of the waters of the Columbia.

The grant of the lands bordering the Columbia River at such fishing places deprived the white citizens of all rights to go over, across, or upon them for the purpose of fishing or erecting buildings or other purposes, and the Indian rights being of no higher nature were likewise revoked and extinguished. Cases *supra* and *The James G. Swan*, 50 Fed. Rep. 108.

Upon the admission of the State of Washington into the Federal Union, "upon an equal footing with the original States," she became possessed, as an inseparable incident to her dominion and sovereignty, of all the rights as to sale of the shore lands on navigable rivers, and the regulation and control of fishing therein, that belonged to the original States.

The title to the shore and lands under water is incidental to the sovereignty of a State,—a portion of the royalties belonging thereto,—and held in trust for the public purposes of navigation and fishery, and cannot be retained or granted out to individuals by the United States; and it depends upon the law of such State to determine to what extent the State has prerogatives of ownership.  Control and regulation shall be exercised subject only to the paramount authority of Congress with regard to public navigation and commerce. *Hardin* v. *Jordan*, 140 U. S. 371; *Shively* v. *Bowlby*, 152 U. S. 1.

Evidence of Indians present at the time of the execution of the treaty between the representatives of the United States

Government and the federated bands of Indians known as the Yakima Nation in 1855 is incompetent and inadmissible when such evidence would tend to vary the plain stipulations of the treaty. *Anderson* v. *Lewis*, 1 Freem. Ch. (Miss.) 178; *Little* v. *Wilson*, 32 Maine, 214.

Where rights of fishing and hunting on the then vacant public lands of the United States were reserved to the whites and Indians "in common," both whites and Indians could use such implements and methods of fishing and hunting in the exercise of their common rights as they saw fit, and the use of fish wheels by the whites in the customary runways of the fish which did not exclude the Indians from fishing elsewhere, would not deprive the Indians of their common right.

MR. JUSTICE McKENNA delivered the opinion of the court.

This suit was brought to enjoin the respondents from obstructing certain Indians of the Yakima Nation in the State of Washington from exercising fishing rights and privileges on the Columbia River in that State, claimed under the provisions of the treaty between the United States and the Indians, made in 1859.

There is no substantial dispute of facts, or none that is important to our inquiry.

The treaty is as follows:

"Article I. The aforesaid confederated tribes and bands of Indians hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the lands and country occupied and claimed by them. . . .

"Article II. There is, however, reserved from the lands above ceded for the use and occupation of the aforesaid confederated tribes and bands of Indians, the tract of land included within the following boundaries: . . . . .

"All of which tract shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians as an Indian reservation; nor shall any white man, excepting those

in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent. And the said confederated tribes and bands agree to remove to, and settle upon, the same, within one year after the ratification of this treaty. In the meantime it shall be lawful for them to reside upon any ground not in the actual claim and occupation of citizens of the United States; and upon any ground claimed or occupied, if with the permission of the owner or claimant.

"Guaranteeing, however, the right to all citizens of the United States to enter upon and occupy as settlers any lands not actually occupied and cultivated by said Indians at this time, and not included in the reservation above named. . . .

"Article III. *And provided* That, if necessary for the public convenience, roads may be run through the said reservation; and, on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways.

"The exclusive right of taking fish in all the streams where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land. . . .

"Article X. *And provided*, That there is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the 'Wenatshapam fishery,' which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations." 12 Stat. 951.

The respondents or their predecessors in title claim under patents of the United States the lands bordering on the Columbia River and under grants from the State of Washington to the shore land which, it is alleged, fronts on the patented land. They also introduced in evidence licenses from the State to maintain devices for taking fish, called fish wheels.

At the time the treaty was made the fishing places were part of the Indian country, subject to the occupancy of the Indians, with all the rights such occupancy gave. The object of the treaty was to limit the occupancy to certain lands and to define rights outside of them.

The pivot of the controversy is the construction of the second paragraph. Respondents contend that the words "the right of taking fish at all usual and accustomed places *in common* with the citizens of the Territory" confer only such rights as a white man would have under the conditions of ownership of the lands bordering on the river, and under the laws of the State, and, such being the rights conferred, the respondents further contend that they have the power to exclude the Indians from the river by reason of such ownership. Before filing their answer respondents demurred to the bill. The court overruled the demurrer, holding that the bill stated facts sufficient to show that the Indians were excluded from the exercise of the rights given them by the treaty. The court further found, however, that it would "not be justified in issuing process to compel the defendants to permit the Indians to make a camping ground of their property while engaged in fishing." 73 Fed. Rep. 72. The injunction that had been granted upon the filing of the bill was modified by stipulation in accordance with the view of the court.

Testimony was taken on the issues made by the bill and answer, and upon the submission of the case the bill was dismissed, the court applying the doctrine expressed by it in *United States* v. *Alaska Packers' Assn.*, 79 Fed. Rep. 152; *The James G. Swan*, 50 Fed. Rep. 108, expressing its views as follows:

"After the ruling on the demurrer the only issue left for determination in this case is as to whether the defendants have interfered or threatened to interfere with the rights of the Indians to share in the common right of the public of taking fish from the Columbia River, and I have given careful consideration to the testimony bearing upon this question. I find from the evidence that the defendants have excluded the Indians from their own lands, to which a perfect absolute title has been acquired from the United States Government by patents, and they have more than once instituted legal proceedings against the Indians for trespassing, and the defendants have placed in the river in front of their lands fishing wheels for which licenses were granted to them by the State of Washington, and they claim the right to operate these fishing wheels, which necessitates the exclusive possession of the space occupied by the wheels. Otherwise the defendants have not molested the Indians nor threatened to do so. The Indians are at the present time on an equal footing with the citizens of the United States who have not acquired exclusive proprietary rights, and this it seems to me is all that they can legally demand with respect to fishing privileges in waters outside the limits of Indian reservations under the terms of their treaty with the United States."

The remarks of the court clearly stated the issue and the grounds of decision. The contention of the respondents was sustained. In other words, it was decided that the Indians acquired no rights but what any inhabitant of the Territory or State would have. Indeed, acquired no rights but such as they would have without the treaty. This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more. And we have said we will construe a treaty with the Indians as "that unlettered people" understood it, and "as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection," and counterpoise the inequality "by the superior justice

which looks only to the substance of the right without regard to technical rules." 119 U. S. 1; 175 U. S. 1. How the treaty in question was understood may be gathered from the circumstances.

The right to resort to the fishing-places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted. And the form of the instrument and its language was adapted to that purpose. Reservations were not of particular parcels of land, and could not be expressed in deeds as dealings between private individuals. The reservations were in large areas of territory and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved "in common with citizens of the Territory." As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given "the right of taking fish at all usual and accustomed places," and the right "of erecting temporary buildings for curing them." The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, the Indians were given a right in the land—the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned. No other conclusion would give effect to the treaty. And the right was intended to be continuing against the United States

.and its grantees as well as against the State and its grantees.

The respondents urge an argument based upon the different capacities of white men and Indians to devise and make use of instrumentalities to enjoy the common right. Counsel say: "The fishing right was in common, and aside from the right of the State to license fish wheels the wheel fishing is one of the civilized man's methods, as legitimate as the substitution of the modern combined harvester for the ancient sickle and flail." But the result does not follow that the Indians may be absolutely excluded. It needs no argument to show that the superiority of a combined harvester over the ancient sickle neither increased nor decreased rights to the use of land held in common. In the actual taking of fish white men may not be confined to a spear or crude net, but it does not follow that they may construct and use a device which gives them exclusive possession of the fishing places, as it is admitted a fish wheel does. Besides, the fish wheel is not relied on alone. Its monopoly is made complete by a license from the State. The argument based on the inferiority of the Indians is peculiar. If the Indians had not been inferior in capacity and power, what the treaty would have been, or that there would have been any treaty, would be hard to guess.

The construction of the treaty disposes of certain subsidiary contentions of respondents. The Land Department could grant no exemptions from its provisions. It makes no difference, therefore, that the patents issued by the Department are absolute in form. They are subject to the treaty as to the other laws of the land.

It is further contended that the rights conferred upon the Indians are subordinate to the powers acquired by the State upon its admission into the Union. In other words, it is contended that the State acquired, by its admission into the Union "upon an equal footing with the original States," the power to grant rights in or to dispose of the shore lands upon navigable streams, and such power is subject only to the

paramount authority of Congress with regard to public navigation and commerce. The United States, therefore, it is contended, could neither grant nor retain rights in the shore or to the lands under water.

The elements of this contention and the answer to it are expressed in *Shively* v. *Bowlby*, 152 U. S. 1. It is unnecessary, and it would be difficult, to add anything to the reasoning of that case. The power and rights of the States in and over shore lands were carefully defined, but the power of the United States, while it held the country as a Territory, to create rights which would be binding on the States was also announced, opposing the dicta scattered through the cases, which seemed to assert a contrary view. It was said by the court, through Mr. Justice Gray:

"Notwithstanding the dicta contained in some of the opinions of this court, already quoted, to the effect that Congress has no power to grant any land below high water mark of navigable waters in a Territory of the United States, it is evident that this is not strictly true."

*        *        *        *        *        *        *        *

"By the Constitution, as is now well settled, the United States, having rightfully acquired the Territories, and being the only Government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, Federal and State, over all the Territories, so long as they remain in a territorial condition. *American Ins Co.* v. *Canter*, 1 Pet. 511, 542; *Benner* v. *Porter*, 9 How. 235, 242; *Cross* v. *Harrison*, 16 How. 164, 193; *National Bank* v. *Yankton County*, 101 U. S. 129, 133; *Murphy* v. *Ramsey*, 114 U. S. 15, 44; *Mormon Church* v. *United States*, 136 U. S. 1, 42, 43; *McAlister* v. *United States*, 141 U. S. 174, 181."

Many cases were cited. And it was further said:

"We cannot doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international

obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory."

The extinguishment of the Indian title, opening the land for settlement and preparing the way for future States, were appropriate to the objects for which the United States held the Territory. And surely it was within the competency of the Nation to secure to the Indians such a remnant of the great rights they possessed as "taking fish at all usual and accustomed places." Nor does it restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enables the right to be exercised.

The license from the State, which respondents plead to maintain a fishing wheel, gives no power to them to exclude the Indians, nor was it intended to give such power. It was the permission of the State to use a particular device. What rights the Indians had were not determined or limited. This was a matter for judicial determination regarding the rights of the Indians and rights of the respondents. And that there may be an adjustment and accommodation of them the Solicitor General concedes and points out the way. We think, however, that such adjustment and accommodation are more within the province of the Circuit Court in the first instance than of this court.

*Decree reversed and the case remanded for further proceedings in accordance with this opinion.*

MR. JUSTICE WHITE dissents.