**KLAMATH AND MODOC TRIBES** and
Yahooskin Band of Snake Indians
et al., Appellants,

v.

**H. G. MAISON, Individually and as Superintendent, Department of State Police, State of Oregon, et al., Appellees,**

and

**United States of America,**
**Intervenor-Appellee.**

**No. 19231.**

United States Court of Appeals
Ninth Circuit.

Nov. 2, 1964.

Cleveland C. Cory, Rockwood, Davies, Biggs, Strayer & Stoel, Portland, Or., for appellants.

Robert Y. Thornton, Atty. Gen. of Oregon, Salem, Or., Roy C. Atchison, Asst. Atty. Gen. of Or., Portland, Or., for appellees.

Ramsey Clark, Asst. Atty. Gen. of U. S., Roger P. Marquis, S. Billingsley Hill,

Dept. of Justice, Washington, D. C., Sidney I. Lezak, Acting U. S. Atty., Portland, Or., amici curiæ: United States.

John W. Cragun, Charles A. Hobbs, Washington, D. C., Richard A. Baenen, Lloyd G. Andrews, Shawano, Wis., Donald C. Gormley, Wilkinson, Cragun & Barker, Washington, D. C., amici curiæ: Menominee Enterprises, Inc.

Donald C. Gormley, Claron C. Spencer, Washington, D. C., for amici curiæ: Withdrawing members of Klamath Tribe et al.

Before CHAMBERS, MERRILL and KOELSCH, Circuit Judges.

MERRILL, Circuit Judge.

Appellees are officers of the State of Oregon, charged with enforcement of Oregon game laws. They have asserted the right and duty to enforce hunting and trapping regulations and statutes of Oregon against appellants' members within an area which, under the Treaty of 1864, 16 Stat. 707, between the United States and appellants, formed a part of appellants' reservation. Appellants have brought this action pursuant to 28 U.S.C. § 2202 (1958) seeking a declaration of their right to hunt and trap in this area, free from Oregon regulation and control.

In 1956 the District Court for the District of Oregon held that such was their right despite the provisions of 18 U.S.C. § 1162 (1958) and 28 U.S.C. § 1360 (1958) (which gave jurisdiction to the State of Oregon over criminal offenses and civil actions to which Indians are parties).[1] Since that date the Klamath Termination Act, 25 U.S.C. §§ 564–564w, has become effective, and the question presented by this case is whether that act and the manner in which it has been carried out have resulted in a loss of appellants' rights within the area in question. Aggrieved by the decision of the District Court, appellants have taken this appeal.

The purpose of the Termination Act is set forth in § 564. It is to provide for

"the termination of Federal supervision over the trust and restricted property of the Klamath Tribe of Indians consisting of the Klamath and Modoc Tribes and the Yahooskin Band of Snake Indians, and of the individual members thereof, for the disposition of federally owned property acquired or withdrawn for the administration of the affairs of said Indians, and for a termination of Federal services furnished such Indians because of their status as Indians."

By § 564d(2) each member of the tribe is given an opportunity "to elect to withdraw from the tribe and have his interest in tribal property converted into money and paid to him," or to remain in the tribe and participate in a tribal management plan prepared pursuant to the Act.

Section 564d(3) provides for the sale of so much of the tribal lands as is necessary to convert into money the shares of the withdrawing members.

Section 564d(5) provides for the management, through a trustee, of the remaining tribal property for the benefit of those electing to remain in the tribe.

Section 564w provides for a taking by the United States of all tribal lands within the Klamath Indian Forest which had not been sold by April 1, 1961.

Section 564q(a) reads as follows:

"Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in sections 564–564w of this title, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the

1. 139 F.Supp. 634 (D.Or.1956).

members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction."

Upon election held under the Act, 1660 members elected to withdraw from the tribe and 473 elected to remain. Thereafter a proportionate part of the original tribal property, equal to the number of remaining members as compared to the entire membership, was transferred by the United States to the United States National Bank of Portland, Oregon, as trustee for the remaining tribe. Of the remaining land area held for sale the greater portion was taken by the United States and now forms a part of the Winema National Forest and the Klamath Forest National Wildlife Refuge.

■ Upon this appeal the issue is whether the remaining members of the tribe have a right to hunt and trap, free from state regulation and control, upon the forest lands taken by the United States pursuant to § 564w. The holding of the District Court was that by virtue of the Termination Act this right was lost. We agree.

The same issue was presented in State v. Sanapaw (1963) 21 Wis.2d 377, 124 N.W.2d 41, cert. denied (1964) 377 U.S. 991, 84 S.Ct. 1911, 12 L.Ed.2d 1044. That case dealt with the Act terminating the Menominee Tribe [2] upon substantially the same terms as those of the Act before us. There the Court referred to House Concurrent Resolution 108, 83d Congress, 1st Session, pursuant to which the Menominee Termination Act was drafted and introduced. That resolution recited the policy of Congress "as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship."

The Wisconsin Supreme Court referred to language of the Act that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." It concluded that "the Termination Act abrogates any right to be free of the state's game laws in exercising hunting rights over the former tribal lands of the reservation."

■ The United States, appearing here as amicus curiae through the Attorney General, has in its brief expressed its view as follows:

"The Klamath Termination Act and the many other termination acts of the 1950's and 1960's conclusively show that Congress now desires the Indians to be amalgamated with the rest of our population and not to be specially treated 'because of their status as Indians' * * * The purpose of the Klamath Termination Act to (a) end federal supervision, (b) remove from the Indians their special status as Indians, and (c) make state laws applicable to them 'in the same manner as they apply to other citizens' are express and unequivocal in the terms of the Act."

We are in agreement with this position.

Notwithstanding this clear evidence of Congressional purpose, appellants contend that their right to hunt and trap, free from state control upon the area involved, is conferred by treaty; that while Congress has the power to abrogate such treaty rights, it will not be assumed to have done so in absence of express language; that there is nothing in the Termination Act limiting their right to hunt and trap upon the lands assigned to them by treaty.

If appellants are correct in their position not only is their right to hunt and trap on the lands in question (or, indeed, on any former reservation lands which may have been taken into private owner-

2. Menominee Termination Act, 25 U.S.C. §§ 891–902 (1958).

ship) one which is free from state control; their right is exclusive; no one else may hunt or trap on these lands. Their treaty secured to the Indians "the exclusive right of taking fish in the streams and lakes, included in said reservation * * *." 16 Stat. 707. By judicial interpretation of the District Court in 1956, 139 F.Supp. at 637, this right was extended to hunting and trapping.

We agree that the Termination Act has not expressly dealt with any treaty rights respecting hunting and trapping. It has, however, most certainly reduced the area to which those rights attach. By treaty the rights of the Indians were limited to the lands of the reservation. By the Klamath Termination Act, supra, it was provided that to the extent necessary to meet the requirements of the Act, lands should be taken from Indian ownership and sold. Such lands clearly were thereby severed from the reservation and thus released from any restrictions imposed upon them as reservation lands by the treaty.

Appellants protest that this result disregards the provisions of § 564m(b) of the Termination Act to the effect that "[n]othing in Sections 564-564w of this title shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty." They contend that their hunting and trapping rights by judicial construction are coextensive with their fishing rights and should, therefore, receive equivalent protection under this section.

If § 564m(b) has preserved to the Indians fishing rights and privileges to the extent previously enjoyed and thus not limited to the present reservation's area (a question not before us), it has done so by an express statutory grant of rights which the Indians could not otherwise have claimed since, under the treaty, their rights were limited to the reservation land. With complete awareness of the Indians' claims to hunting and trapping rights Congress has seen fit to limit the application of this section to fishing alone and must be presumed to have intended the section to be thus limited.

Judgment of the District Court as to the remaining members of the tribe is affirmed.

■ The District Court judgment also, in some respects, declared the rights of withdrawing members of the tribe. These members were not parties to the action, and all parties are in agreement that judgment should not be binding upon them. To the extent that the judgment of the District Court declared the rights of withdrawing members, it is reversed.