Charles E. KIMBALL et al., Plaintiffs-
Appellants,

v.

John D. CALLAHAN et al.,
Defendants-Appellees.

No. 73–1512.

United States Court of Appeals,
Ninth Circuit.

Feb. 26, 1974.

Daniel H. Israel (argued), Reid P. Chambers, Native American Rights Fund, Los Angeles, Cal., Larry A. Aschenbrenner, Don B. Miller, Klamath Falls, Or., for plaintiffs-appellants.

Raymond P. Underwood (argued), Chief Counsel, Portland Div., Oregon Dept. of Justice, Beverly B. Hall (argued), Asst. Atty. Gen., Portland, Or., for defendants-appellees.

Before KOELSCH, WRIGHT and KILKENNY, Circuit Judges.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

Plaintiffs-appellants are Klamath Indians by racial ancestry and claim rights under the Treaty of October 14, 1864, 16 Stat. 707, which established the Klamath and Modoc Reservation in Oregon. Pursuant to the Klamath Termination Act, 25 U.S.C. §§ 564–564x, plaintiffs or their ancestors elected to withdraw from the tribe and have their interest in tribal property converted into money and paid to them. 25 U.S.C. § 564d(a)(2).[1] In order to pay the withdrawing members of the tribe, part of the original tribal property was sold, the greater part being taken by the United States. It now forms a part of the Winema National Forest and the Klamath Forest National Wildlife Refuge.

Plaintiffs seek a declaratory judgment declaring their right to hunt, trap, and fish within their ancestral Klamath Indian Reservation free of Oregon fish and game regulations, pursuant to the Treaty of October 14, 1864, *supra*. They also seek an injunction restraining defendants, officers of the State of Oregon, from applying and enforcing Oregon fish and game regulations against them within the boundaries of the old reservation.

The district court denied relief and dismissed the complaint for failure to state a claim upon which relief could be granted. We reverse and grant plaintiffs the declaratory relief they seek.

## I

## JURISDICTION

At the outset, we note that the defendants challenge the jurisdiction of this court and the district court over the subject matter of this action. The district court had jurisdiction if the matter in controversy exceeded the sum or value of $10,000, exclusive of interest and costs, and arose under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331. We find jurisdiction. The matter in controversy is the right to be free from state regulations, and the value of this right is measured by the extent to which plaintiffs' treaty rights to hunt and fish would be impaired by state regulation. Yoder v. Assiniboine and Sioux Tribes of Fort Peck Indian Reservation, 339 F.2d 360, 363 (9th Cir. 1964).

More specifically, the amount in controversy is measured by determining the value to each plaintiff of the game and fish he would take if completely free of regulation, less the value of the limited amounts of game and fish he could take if regulated by the state.[2] Under similar circumstances this court has found jurisdiction under 28 U.S.C. § 1331, thereby implicitly finding a matter in controversy exceeding a value of $10,000. Holcomb v. Confederated Tribes of Umatilla Indian Reservation, 382 F. 2d 1013, 1014 n. 4 (9th Cir. 1967); *see also* Leech Lake Band of Chippewa Indians v. Herbst, 334 F.Supp. 1001, 1002 (D.Minn.1971). At any rate, we cannot say with "a legal certainty" that the value of the matter in controversy is really less than the jurisdictional amount. City of Inglewood v. City of Los Angeles, 451 F.2d 948, 952 (9th Cir. 1972).[3]

---

1. For a description of the termination process, *see* Klamath and Modoc Tribes v. United States, 436 F.2d 1008, 93 Ct.Cl. 670, cert. denied, Anderson v. United States, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971).

2. We do not decide whether the damages to the individual plaintiffs can be aggregated to reach the sum of $10,000.

3. Given jurisdiction under 28 U.S.C. § 1331, the district court had the power, under 28 U.S.C. § 2201, to render the declaratory relief sought by plaintiffs. This court has jurisdiction under 28 U.S.C. § 1291.

## II

## THE TREATY RIGHTS

The Treaty of October 14, 1864, 16 Stat. 707, described the boundaries of the Klamath and Modoc Reservation and stated that the described tract "shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation. . ." The treaty secured for the Indians "the exclusive right of taking fish in the streams and lakes included in said reservation. . . ." In 1956 the district court judicially interpreted this treaty also to provide the Indians with the exclusive right to hunt and trap on the reservation without state regulation or control. Klamath & Modoc Tribes v. Maison, 139 F.Supp. 634 (D.Or.1956).

Before deciding if these rights survive the Klamath Termination Act, we first consider whether the treaty was correctly interpreted to include hunting and trapping rights.[4]

In Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Supreme Court considered the Treaty of Wolf River of 1854, 10 Stat. 1064, which granted the Menominee Indians a reservation in Wisconsin. The treaty made no mention of hunting and fishing rights, but provided that the reservation was to be held by the Indians "for a home, to be held as Indian lands are held." The Court agreed with the Court of Claims that this language includes the right to hunt and fish. 391 U. S. at 406, 88 S.Ct. 1705;[5] Menominee Tribe v. United States, 388 F.2d 998, 1002, 179 Ct.Cl. 496, 503–504 (1967); State v. Sanapaw, 21 Wis.2d 377, 383, 124 N.W.2d 41, 44 (1963).

We find that the language "set apart as a residence for said Indians, [and] held and regarded as an Indian reservation" also includes those rights. The specific treaty provision reserving the Klamaths' exclusive right to fish could prompt the argument that their treaty excludes the right to hunt. However, in light of the highly significant role that hunting and trapping played (and continue to play) in the lives of the Klamaths,[6] it seems unlikely that they would have knowingly relinquished these rights at the time they entered into the treaty. *See* Menominee Tribe v. United States, 391 U.S. at 406, 88 S.Ct. 1705; State v. Sanapaw, *supra*, 21 Wis.2d at 383, 124 N.W.2d at 44. Moreover, they enjoyed the exclusive rights to hunt, trap, and fish for almost 100 years with the consent and acquiescence of the State of Oregon. Klamath and Modoc Tribes v. Maison, 139 F.Supp. 634, 637 (D.Or. 1956). These facts, coupled with our duty to construe the treaty favorably to the Indians with whom it was made,[7] lead us to conclude that the treaty provides exclusive rights to hunt and trap, as well as fish, free of state regulation.

4. Defendants state that an earlier decision of this court overruled the district court's interpretation of the treaty to include hunting and trapping rights. This is incorrect. In Klamath and Modoc Tribes v. Maison, 338 F.2d 620 (9th Cir. 1964), we held, incorrectly in light of Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), that whatever treaty rights the Indians had on land transferred as a result of the Klamath Termination Act were lost. We did not find that the treaty failed to provide hunting and trapping rights. We held that if § 564m(b) of the Act provides fishing rights on the severed land, a question not before us at the time, the rights would be grounded in an express statutory grant rather than in the treaty. Section 564m(b) is discussed in part III of this opinion, *infra*.

5. The Court noted that this language sums up in one phrase "the familiar provisions of earlier treaties which recognized hunting and fishing as normal incidents of Indian life." 391 U.S. at 406 n. 2, 88 S.Ct. at 1707.

6. Klamath & Modoc Tribes v. Maison, 139 F. Supp. 634 (D.Or.1956).

7. The Supreme Court in *Menominee Tribe* reiterated its earlier statement in United States v. Winans, 198 U.S. 371, 380–381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), that
"[W]e will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and pro-

## III

## EFFECT OF THE KLAMATH TERMINATION ACT

In 1954 Congress passed the Klamath Termination Act, which became fully effective in 1961. 25 U.S.C. §§ 564-564x. The express purpose of this Act was to terminate federal supervision over the Klamath Tribe of Indians, to dispose of federally owned property acquired for the administration of Indian affairs, and to terminate the provision of federal services to the Indians solely because of their status as Indians.

Pursuant to the Klamath Termination Act, a final roll of all adult members of the tribe was prepared and published in 1956. 25 U.S.C. § 564b. Under the Act, each person whose name appeared on this tribal roll had to elect whether to withdraw from the tribe and receive the money value of his interest in tribal property or to remain in the tribe and participate in a nongovernmental tribal management plan. The Act provides that "[m]embers of the tribe who receive the money value of their interests in tribal property shall thereupon cease to be members of the tribe. . . ." 25 U.S.C. § 564e(c).

On the final tribal roll were 2,133 persons. Of these, 1,660 elected to withdraw from the tribe and take their interests in cash. The remaining 473 elected to retain their interests in land and to participate in the land management plan. A part of tribal land proportionate to the number of remaining members was transferred to a private trustee to administer under the statutory management plan. The remainder was sold to pay the withdrawn members, and the majority of this portion is now United States national forest land.

Plaintiffs are five Klamath Indians who withdrew from the tribe. They claim that they nevertheless retain treaty rights to hunt, trap, and fish free of state regulation on the former Indian land that was sold to pay them for their shares in tribal property. Feeling compelled by Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), we agree.

The Menominee Termination Act [25 U.S.C. §§ 891–902] is similar in several respects to the Klamath Termination Act. Both provide basically for the termination of federal supervision over the property and members of the respective tribes. The Wisconsin Supreme Court held in State v. Sanapaw, 21 Wis.2d 377, 124 N.W.2d 41 (1963), that the hunting and fishing rights of the Menominee Indians were abrogated by Congress in the Menominee Termination Act. The tribe then brought suit against the United States in the Court of Claims to recover damages for the loss of those rights. Menominee Tribe of Indians v. United States, 388 F.2d 998, 179 Ct.Cl. 496 (1967). That court awarded no damages, concluding that the Termination Act did not abrogate the Indians' rights to hunt and fish. 388 F.2d at 1005–1006.

The Supreme Court affirmed the Court of Claims. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). The Court noted that the effect of the Termination Act was that all federal supervision over the tribe and tribal property was to end and that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 25 U.S.C. § 899. The Court acknowledged that this language supports a forceful argument that the Termination Act submitted the hunting and fishing rights of the Indians to state regulation and control. The Court, however, reached the opposite conclusion. 391 U.S. at 410, 88 S.Ct. 1705.

Its conclusion was based in large part on Public Law 280 [18 U.S.C. § 1162],

---

tection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right, without regard to technical rules.' "

391 U.S. at 406 n. 2, 88 S.Ct. at 1707; McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

passed at the same time as the Menominee and Klamath Termination Acts and which became effective seven years before the Termination Acts became fully effective. That law granted certain states jurisdiction "over offenses committed by or against Indians in the areas of Indian country" named in the Act, which in the case of Wisconsin was described as "All Indian country within the State," and in the case of Oregon, as "All Indian country within the State except the Warm Springs Reservation." But Public Law 280 provided further that "Nothing in this section . . . shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute *with respect to hunting, trapping, or fishing* or the control, licensing, or regulation thereof." (Emphasis added.)

The Supreme Court noted that, at the time Public Law 280 became effective in 1954, the Menominee Reservation had not been terminated and it was still "Indian country" within the meaning of the law. Similarly, the Klamath and Modoc Reservation in Oregon was still "Indian country." The Court held that Public Law 280 preserved treaty hunting and fishing rights even after termination. The Court's reasoning compels our conclusion in the present case.

> Public Law 280 must therefore be considered *in pari materia* with the Termination Act. The two Acts read together mean to us that although federal supervision of the tribe was to cease *and all tribal property was to be transferred to new hands*, the hunting and fishing rights granted or preserved by the Wolf River Treaty of 1854 survived the Termination Act of 1954.

391 U.S. at 411, 88 S.Ct. at 1710. [Emphasis added.]

The Court stated that this construction is in accord with the purpose of the

Termination Act, which is only to terminate federal *supervision* over tribal property and members. Both the Menominee and the Klamath Termination Acts contain a provision rendering inapplicable "all statutes of the United States which affect Indians because of their status as Indians." 25 U.S.C. §§ 899 and 564q. The Court stated that this provision "plainly refers to the termination of federal supervision. The use of the word 'statutes' is potent evidence that no *treaty* was in mind." 391 U.S. at 412, 88 S.Ct. at 1711.

The Court emphasized that it would not "construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians." It stated that the intention to abrogate or modify a treaty is not to be lightly imputed to Congress, and it found it "difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty . . . ." 391 U.S. at 412–413, 88 S.Ct. at 1711.

Defendants argue that *Menominee Tribe* is distinguishable because of significant differences between the Menominee and Klamath Termination Acts. True, unlike the Klamath Termination Act, the Menominee Act gave no option to the Menominee Indians to withdraw from the tribe and receive the money value of their interests in tribal property.[8] Also, although title to the reservation changed hands in *Menominee Tribe,* the Menominees continued to occupy the same land before and after the Termination Act. The disputed land in this case, on the other hand, is no longer legally occupied by the Klamaths.

While these are substantial points of distinction, we find nothing in the language of *Menominee Tribe* to indicate its reasoning does not transcend these distinctions.[9]

---

8. The Menominee Termination Act did, however, provide for the payment of $1,500 to each member of the tribe on the final tribal roll. 25 U.S.C. § 894.

9. Indeed, the reason of *Menominee Tribe* may be even more compelling in this case. At the hearings on the Klamath Termination bill, Senator Watkins suggested that the Govern-

Defendants also contend that the reasoning of an earlier decision of this court supports their position. In Klamath and Modoc Tribes v. Maison, 338 F.2d 620 (9th Cir. 1964), certain members of the Klamath tribe, none of whom had elected to convert his tribal interest into money, sought a declaration of their right to hunt and trap, free from Oregon regulation and control, in an area that had formed part of their reservation prior to the Klamath Termination Act. This Court refused to grant such relief and held that, as a result of the Termination Act, no treaty rights attach to land severed from the former reservation. We acknowledge that the Termination Act does not expressly deal with any treaty rights respecting hunting and trapping. We held, however, that the treaty rights are limited to the lands of the reservation and that the Act, by effectively reducing the size of the reservation, "most certainly reduced the area to which those rights attach." 338 F.2d at 623.

This reasoning cannot stand in light of *Menominee Tribe*. It is inconsistent with the Supreme Court's requirement that Congress clearly indicate when it intends to abrogate treaty rights. Moreover, it is inconsistent with the Court's construction of Public Law 280 that treaty rights with respect to hunting, trapping, or fishing survive the Termination Acts to the extent that they attach to land known as "Indian country" at the time Public Law 280 became effective.

Congress not only failed to indicate clearly an intent to abrogate treaty rights; it in fact expressly preserved at least fishing rights on the former reservation. The Termination Act provides that "[n]othing [in the Act] shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty." 25 U.S.C. § 564m (b). This court in Klamath and Modoc Tribes v. Maison, 338 F.2d 620 (9th Cir. 1964), stated that if this provision does provide fishing rights on the entire former reservation, a question not before us at the time, it did so by an express statutory grant since the treaty rights themselves could only extend to the now shrunken reservation. Defendants in this case offer a different interpretation and suggest that § 564m(b) does not aid plaintiffs since it applies to "the tribe or the members thereof" and plaintiffs are no longer "members" of the tribe.

■ Neither of these constructions withstands analysis. Since the Act provides that nothing in it shall abrogate any treaty fishing rights, we conclude that a Klamath Indian possessing such rights on the former reservation at the time of its enactment retains them even though he relinquishes his tribal membership or the reservation shrinks pursuant to the Act. Otherwise, the Act would in fact have resulted in the abrogation of treaty rights.

■ One final consideration this court must make concerns the extent of plaintiffs' rights that we here hold survive the Termination Act. Plaintiffs seek no rights against private landowners, acknowledging that those persons might properly exclude Klamaths and anyone else from hunting and fishing if they so desire.[10] Plaintiffs do, however, seek a declaration, and we so hold, that they may exercise their treaty hunting, trapping, and fishing rights free of state fish and game regulations on the lands constituting their ancestral Klamath In-

ment "buy out" the Indians' hunting and fishing rights rather than preserve them after termination. See Joint Hearings, Subcommittees of the Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 4, on S.2745 and H.R.7320 pp. 254–55. Congress did not heed this suggestion, however.

The Klamath Termination Act provides that withdrawn members of the tribe relinquish their interests in tribal property. 25 U.S.C. § 564e(c). Treaty rights to hunt and fish are, however, rights of the individual Indians. McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 181, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Mason v. Sams, 5 F.2d 255, 258 (W.D.Wash.1925).

10. We make no holding and intimate no opinion on the treaty rights of the Indians vis-a-vis the private Oregon landowners.

dian Reservation, including that land now constituting United States national forest land and that privately owned land on which hunting, trapping, or fishing is permitted.[11]

Accordingly the judgment of the district court is reversed.

11. Plaintiffs do not seek *exclusive* rights, to hunt, trap, and fish on land transferred pursuant to the Termination Act.