**KLAMATH INDIAN TRIBE,**
**Plaintiff-Appellee,**

v.

**The OREGON DEPARTMENT OF FISH AND WILDLIFE, et al.,**
**Defendants-Appellants.**

**No. 83–3660.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 1984.

Decided March 27, 1984.

Don B. Miller, Native American Rights Fund, Boulder, Colo., for plaintiff-appellee.

Michael Reynolds, Salem, Or., for defendants-appellants.

Before KILKENNY, WALLACE and CANBY, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant Oregon Department of Fish and Wildlife appeals from part of the district court's grant of summary judgment in favor of the Klamath Indian Tribe. The court held, in part, that the Tribe, and not the state, has the right to regulate tribal members' hunting, fishing and trapping on lands ceded to the United States in 1901. We affirm.

## FACTS

In 1864, the Klamath and Modoc Tribes, along with the Yahooskin Band of Snake Indians, ceded to the United States roughly 20 million acres of aboriginal lands. In return, they received a 1.9 million acre reservation. Treaty of October 14, 1864, 16 Stat. 707 (1866). A portion of the treaty provided:

> [T]he following described tract ... shall, ... be set apart as a residence for said Indians, [and] held and regarded as an Indian reservation.... [T]he exclusive right of taking fish in the streams and lakes, included in said reservation, ... is hereby secured to the Indians....

Government surveyors twice surveyed the reservation boundaries, once in 1871 and again in 1888. Both surveys failed to include large tracts of land concededly intended for the reservation. Following years of tribal complaints, Congress authorized a commission to determine the amount and value of the excluded land. In 1896 the commission concluded that 617,-000 acres were erroneously excluded, and that the land was worth $553,270, or 86.36 cents per acre. This figure was based on soil quality, grazing lands, timber, and the quantity of rock formation. Tribal members' hunting, fishing and trapping rights were not mentioned.

In 1901 the Bureau of Indian Affairs negotiated an agreement with the Tribe for cession of the excluded lands at the rate of 86.36 cents per acre. The agreement relied on a survey accepted by the General Land Office that shows 621,824 acres excluded. The agreement provided in part:

> [N]othing in this agreement shall be construed to deprive the [Tribe] of any benefits to which they are entitled under existing treaties, not inconsistent with the provisions of this agreement.

Congress ratified the agreement in 1906. Act of June 21, 1906, 34 Stat. 366. Virtually all ceded lands were immediately closed to entry and placed in national forests or parks.

In 1969 the Indian Claims Commission awarded the Tribe over four million dollars for the ceded lands because of the unconscionable consideration originally paid the Tribe. The ICC did not mention tribal members' hunting, fishing and trapping rights in its calculations. *Klamath & Modoc Tribes v. United States*, 20 Ind.Cl. Comm. 522, 525–26 (1969).

The parties agree that the state has no authority to regulate Indian hunting, fishing and trapping on reservation lands. They also agree that these activities were essential to the Tribe's survival when the 1864 Treaty was executed and remain a significant part of the tribal lifestyle today. Tribal members have continued to hunt, fish and trap on the ceded lands from 1906 to the present, without regard for state laws and regulations.

This court has held that under the same treaty, tribal members who elected to withdraw from the Tribe pursuant to the Klamath Termination Act of 1954 nevertheless retained treaty rights to hunt, fish and trap on former reservation lands. *Kimball v. Callahan*, 493 F.2d 564 (CA9), *cert. denied*, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) (*Kimball I*); *Kimball v. Callahan*, 590 F.2d 768 (CA9), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (*Kimball II*). The lands in *Kimball I* and *II* constituted national forest land and that private land on which hunting, trapping or fishing was permitted. 493 F.2d at 569–70.

The Tribe filed this action to enjoin Oregon state agencies and officials from interfering with tribal members who hunt, fish or trap on the ceded lands.

## ISSUE

Whether the Klamath Indian tribal members retained hunting, fishing and trapping rights on lands ceded to the United States in 1901, so that they may exercise those rights free of state regulation.

## STANDARD OF REVIEW

No genuine issues of material fact are present. Accordingly, this court must determine whether the district court's decision was erroneous as a matter of law. *California ex rel. Younger v. Tahoe Reg. Planning Agency*, 516 F.2d 215, 217 (CA9), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

## DISCUSSION

■■■ A treaty is a grant of rights from the Indians to the grantee. It is not, as suggested by appellant, a grant of rights to the Indians. All rights not granted are reserved to the Indians and these rights are to every individual Indian as though named in the instrument of transfer. *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). The reserved rights impose a servitude on every piece of land as though specifically described therein. *Winans, Id.* A tribe retains all rights not expressly ceded in the treaty so long as the rights are consistent with the tribe's sovereign status. *United States v. Adair*, 723 F.2d 1394, 1413 (CA9 1983).

■■ Indian treaties should be construed as the tribes would have understood them, *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970), and they are broadly interpreted in the Indian's favor. *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658 at 676, 99 S.Ct. 3055 at 3069, 61 L.Ed.2d 823 (1979).

Here, the Tribe seeks the right to regulate its tribal members' hunting, fishing and trapping activities, free of state interference. It does not claim that its members may conduct those activities on private land, absent consent of the landowner. *See Antoine v. Washington*, 420 U.S. 194, 207 n. 11, 95 S.Ct. 944, 952 n. 11, 43 L.Ed.2d 129 (1975). Simply stated, we must first determine whether the 1864 Treaty reserved for the Tribe the right to hunt, fish and trap on the ceded lands.

The Tribe relies on this court's decisions in *Kimball I* and *II*. The court in *Kimball*

*I* held that tribal members who withdrew from the tribe pursuant to the Klamath Termination Act still retained the right to hunt, fish and trap on former reservation lands. *Kimball I* relied on *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), where the Court held that treaty language included the right to hunt and fish, *even though the treaty made no mention of hunting and fishing rights.* The court in *Kimball I* noted that the Tribe enjoyed the exclusive rights to those activities for nearly 100 years with the consent and acquiesence of the state; that courts have a duty to construe treaties favorably to Indians; and that it was unlikely that the Tribe would have knowingly relinquished hunting and fishing rights when they entered into the treaty. *Kimball I,* 493 F.2d at 566.

The state argues initially that *Kimball I* and *Menominee* are distinguishable. The essence of its argument is twofold—one, because the ceded lands were never a part of the reservation the treaty does not apply to them and two, hunting, fishing and trapping rights are appurtenant to occupancy rights, and therefore when the Tribe ceded its property rights it also gave up its right to hunt, fish and trap on the ceded lands.

■ Neither argument is sound. First, the Tribe and the government understood the treaty to include the land erroneously excluded. Survey errors cannot diminish a reservation's boundaries. *Sekaquaptewa v. MacDonald,* 626 F.2d 113, 118 (CA9 1980). The subsequent cession agreement itself served to compensate the Tribe for the land erroneously excluded, but made no mention of hunting, fishing and trapping rights.

■ Second, treaty rights to hunt and fish are not appurtenant to the Tribe's property interest in the former reservation land itself. The fact that such rights may continue to exist apart from ownership of the land was reaffirmed in *Kimball II,* 590 F.2d at 772–73. Other courts have also upheld retention of treaty rights to hunt and fish despite loss of possessory title. *See Lower Brule Sioux Tribe v. South*

*Dakota,* 711 F.2d 809, 823 (CA8 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984); *Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341, 352 (CA7), *cert. denied,* —— U.S. ——, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). *See also United States v. Adair,* 723 F.2d at 1412 (Klamath Termination Act did not abrogate tribal water rights as reserved in 1864 Treaty).

■ Article IV of the cession agreement states that the Tribe is entitled to all benefits under existing treaties not inconsistent with the agreement. Treaty rights to hunt, fish and trap are not inconsistent with the agreement. The agreement provided for payment to the Tribe at a rate of 86.36 cents per acre, however neither the Boundary Commission Report nor the cession agreement mentioned compensation for the Indian's hunting, fishing and trapping rights. These rights are valuable property rights, and abrogation by Congress gives rise to a claim for compensation under the fifth amendment. COHEN, HANDBOOK OF INDIAN LAW, at 468 (1982). *See Menominee Tribe,* 391 U.S. at 413, 88 S.Ct. at 1711. *See also Shoshone Tribe v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Whitefoot v. United States,* 155 Ct.Cl. 127, 293 F.2d 658, 659 (1961), *cert. denied,* 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962); 13 Stat. 324 (1864). ($5,000 paid for off-reservation hunting and fishing rights). The United States converted substantially all of the ceded lands into national forests or parks immediately following execution of the cession agreement. Clearly, use of those lands as forests or parks is not diminished by exercise of the right to hunt, fish and trap on those lands. *See Lower Brule,* 711 F.2d at 817–18.

■ Having decided that the right to hunt, fish and trap on the ceded lands is not inconsistent with the cession agreement, the Tribe's treaty rights may be abrogated only by a showing of clear congressional intent. In this context, we are obliged to examine the face of the 1906 Act, the surrounding circumstances, and the legislative history. *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977). The State argues that examination of these fac-

tors shows clear congressional intent to abrogate treaty rights. We cannot agree.

Again, we reemphasize that nowhere in the 1906 Act are hunting, fishing and trapping rights mentioned. The state asserts that retention of treaty rights is contrary to the Tribe's agrarian progress and the dominant purpose of the Act, to convert the Indians into an agricultural people. The purpose of the Act, as shown by the pretreaty negotiations and the congressional history, was to settle a boundary dispute while continuing to honor the Tribe's treaty rights. In fact, only a small part of the ceded lands was usable for agricultural purposes, and was far better suited for hunting, fishing and trapping.

The United States acts in one of two capacities when dealing with the Indians, either as trustee or as sovereign, in exercise of its powers of eminent domain, *United States v. Sioux Nation,* 448 U.S. 371, 408–09, 100 S.Ct. 2716, 2737–38, 65 L.Ed.2d 844 (1980). Federal executive officials must exercise due care in administration of Indian property; they cannot as a result of a negligent survey give tribal lands or rights to others or appropriate them to their own purposes. *See United States v. Creek Nation,* 295 U.S. 103, 109–10, 55 S.Ct. 681, 683–84, 79 L.Ed. 1331; COHEN, at 226, 486. In this case, the United States acted as trustee in executing the cession agreement. *See C & O Land Co. v. Rankin,* 87 Fed. 532, 533 (D.Or. 1898). An interpretation of the Act as abrogating hunting and fishing rights would be wholly inconsistent with the government's trustee status. The failure to compensate the Tribe for those rights further evidences a lack of congressional intent to abrogate the Tribe's rights.

Finally, the legislative history demonstrates that the Interior Department and the Tribe understood that the treaty rights extended to the land described in the treaty, including the land erroneously excluded. The Tribe insisted upon inclusion of those lands when the treaty was signed, and complained for years until a boundary commission was established to correct the boundary errors.

Congress has the ability to directly express its intent regarding imposition of state law. *See Bryan v. Itasca County,* 426 U.S. 373, 389 & n. 15, 96 S.Ct. 2102, 2111 & n. 15, 48 L.Ed.2d 710 (1976). The state has not shown the clear congressional intent required to abrogate the Tribe's treaty rights. *See Kimball I,* 493 F.2d at 569.

In sum, the Tribe and its members retained their treaty rights to hunt, fish and trap on the ceded lands. It follows that those rights may be exercised free of usual state regulation. *See Kimball I,* 493 F.2d at 566.

## CONCLUSION

The judgment of the district court is hereby AFFIRMED.