**STATE of Minnesota, Appellant,**

v.

**Bernard CLARK, Jack Fulstrom, et al., Respondents.**

Nos. 47837–47849.

Supreme Court of Minnesota.

Aug. 3, 1979.

Rehearing Denied Oct. 1, 1979.

---

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., James M. Schoessler, Sp. Asst. Atty. Gen., St. Paul, John E. Pearson, County Atty., Detroit Lakes, for appellant.

Peterson, Tupper & Smith, and Kent P. Tupper and Peter W. Cannon, Walker, Bernard P. Becker, St. Paul, for respondents.

Aurel L. Ekvall, County Atty., Bagley, David Albert Mustone of Tobin & Covey, Washington, D. C., Tom D. Tobin of Tobin & Covey, Winner, S. D., amicus curiae.

SCOTT, Justice.

This matter consists of appeals by the State of Minnesota from an order of the Becker County District Court dismissing the prosecutions of thirteen Chippewa Indians for violations of state game and fish laws. We affirm.

The pertinent facts are presented upon stipulation of the parties. Defendants are enrolled members of the White Earth Band of Chippewa Indians.[1] Each defendant was arrested for violating a state game or fish law[2] on tracts of land not owned by or for the Minnesota Chippewa Tribe, the White Earth Band, or an individual Indian, but within the boundaries of the White Earth

---

1. This band is one of the six Chippewa bands comprising the Minnesota Chippewa Tribe. The Minnesota Chippewa Tribe is a Federally-recognized Indian tribe organized under the Wheeler-Howard Act of 1934, 25 U.S.C.A. § 461 et seq. *State v. Forge*, 262 N.W.2d 341, 343, n. 2 (Minn.1977), appeal dismissed, 435 U.S. 919, 98 S.Ct. 1479, 55 L.Ed.2d 512 (1978).

2. Defendants Fulstrom and Clark were charged with spearing walleyes with the aid of a light, a misdemeanor. Defendants Brunner, Larson,

Reservation as established by the Treaty of 1867.[3]

Following their arrests, the defendants moved the district court[4] to dismiss the prosecutions on the ground that the court lacked subject matter jurisdiction. The court granted these motions by order dated May 20, 1977. In a memorandum attached to its order the district court concluded that the state was without jurisdiction to enforce its game and fish laws against enrolled members of the White Earth Tribe on all land within the 1867 boundaries of the White Earth Reservation.

Pursuant to Rule 29.03, Minnesota Rules of Criminal Procedure, the state appealed to this court.[5] Subsequently, the cases were remanded to the district court for the purpose of completing and supplementing the record. Upon remand, the parties entered into a comprehensive factual stipulation. Thereafter the state resubmitted its appeals, and by order of November 24, 1978, these appeals were reinstated. The counties of Beltrami, Cass, Clearwater, Hubbard, Koochiching, Lake of the Woods, Mahnomen, Pennington, and Polk were granted permission to file a brief as amici curiae.

The limited issue presented by these appeals is whether the state has jurisdiction to enforce its game and fish laws against enrolled members of the White Earth Band on non-Indian-owned land within the White Earth Reservation boundaries as established by treaty in 1867.[6] Pursuant to Public Law 280 (18 U.S.C.A. § 1162; 28 U.S.C.A. § 1360), the Federal government expressly granted to the State of Minnesota, subject to certain exceptions, the authority to exercise both civil and criminal jurisdiction within "Indian country."[7]

18 U.S.C.A. § 1151 was enacted in 1948, and statutorily defines "Indian country" as:

" * * * (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

18 U.S.C.A. § 1162, enacted in 1953, specifically granted to the State of Minnesota jurisdiction over criminal offenses committed within "Indian country" (except for the Red Lake Reservation). That statute provided, however, that:

French, Leonard E. Butcher, Walter Butcher, Annette, Gjustrom, Stewart, Fineday, Leonard Butcher and Harold Brown were arrested for shining or otherwise illegally taking deer, gross misdemeanors.

3. The White Earth Reservation was created by treaty with the Chippewa in 1867, 16 Stat. 719, II Kappler, Laws and Treaties [hereinafter Kappler], p. 974.

4. Defendants Fulstrom and Clark pleaded guilty to the misdemeanor charges in county court and appealed their cases to district court. All other defendants, having been charged with gross misdemeanors, were bound over to the district court following their arrests.

5. In accordance with Rule 29.03, subd. 1(2), the state sought permission to appeal from the order dismissing the misdemeanor convictions of Clark and Fulstrom. As respects the remaining defendants, the state appealed as of right pursuant to Rule 29.03, subd. 1(1).

6. It should be emphasized that the only question presented by the instant factual situation for our review is whether the state has jurisdiction to regulate the hunting and fishing activities of defendants on the land in question. Thus, the issue of whether Indians may, as a matter of property law, enter onto privately-owned lands to hunt and/or fish is not raised by this case, and therefore we intimate no opinion as to the proper resolution of that question.

7. Public Law 280 applies to all "Indian country" within the state of Minnesota, with the exception of the Red Lake Indian Reservation. See, 18 U.S.C.A. § 1162(a); 28 U.S.C.A. § 1360(a).

" * * * (b) [n]othing in this section shall * * * deprive any Indian or any Indian tribe, band or community of any right, privilege or immunity afforded under Federal treaty agreement or statute with respect to *hunting, trapping or fishing or the control, licensing or regulation thereof.*" (Emphasis added.)

Defendants contend, and the district court concluded, that these statutes preclude the state from regulating the hunting and fishing activities at issue here. The state and amici counter with a twofold argument. They first claim that the various offenses for which defendants were charged did not occur within "Indian country" and thus the state's authority to legislate over activities within its jurisdiction is not limited by the exceptions set out in Public Law 280. Second, they argue that, even if "Indian country" is involved, the White Earth Indians do not presently have hunting and fishing rights established by treaty within the area in question. After careful consideration we are persuaded that defendants and the district court are correct in their analysis of the various authorities, and thus we agree with defendants' claim.

The parties have stipulated that all of the violations in question occurred on land not owned by or for the Minnesota Chippewa Tribe, the White Earth Band, or an individual Indian. Accordingly, the land involved here is "Indian country" only if it lies within the limits of an Indian reservation. It is undisputed that this land is located within the boundaries of the White Earth Reservation as created by the Treaty of 1867.[8] However, the state and amici argue that this area is no longer "Indian country" as defined by 18 U.S.C.A. § 1151(a) because the White Earth Reservation was disestablished by the Nelson Allotment Act of 1889, 25 Stat. 642.[9] Since we find our holding in *State v. Forge*, 262 N.W.2d 341 (Minn.1977), appeal dismissed, 435 U.S. 919, 98 S.Ct. 1479, 55 L.Ed.2d 512 (1978), to be controlling, we must reject this claim.

The Nelson Act was promulgated in 1889 and named after its chief proponent, Representative Knute Nelson. This legislation was one of a series of allotment acts passed by Congress after the passage of the General Allotment, or Dawes, Act of 1887, 24 Stat. 388.[10] The Nelson Act provided for the establishment of a commission (known as the Rice Commission) to negotiate with the Chippewa "for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake [11] Reservations * * *." The act was designed to concentrate Minnesota's Chippewa Indian population (except the Red Lake Band) on the White Earth Reservation and open up the other Chippewa reservations to white settlement.[12] See, generally, 4 Folwell, History of Minnesota, pp. 219–35. As respects the White Earth Reservation, the act provided that the commissioners were to negotiate for the cession of so much of the

---

**8.** As described in Article II of the Treaty of 1867 (see n. 3, *supra*), the White Earth Reservation was to contain 36 townships of land in a square form. As surveyed, it consisted of Townships 141 through 146 North, Ranges 37 through 42 West, 5th Principal Meridian. The parties have stipulated that this amounts to approximately 854,741 acres, 55,979 of which are meandered bodies of water.

**9.** See, I Kappler, p. 301.

**10.** See, I Kappler, p. 33.

**11.** In addition to its provision relating to the White Earth Reservation, the Nelson Act authorized the commissioners to negotiate with the Red Lake Band of Chippewa for the sale of some of its land to the government. Eventually, pursuant to these negotiations, 2.4 million acres of the Red Lake Reservation were ceded to the United States. See, *United States v. Minnesota*, 466 F.Supp. 1382, 1384 (D.Minn. 1979).

**12.** As explained in *State v. Forge, supra*, this goal of concentrating the Chippewa never came about, and by 1890 only 775 Indians out of a total population of 4,000 had moved to the White Earth Reservation. 262 N.W.2d 346, n. 18.

reservation " * * * as in the judgment of said commission is not required to make and fill allotments required by this and existing acts * * *." On July 29, 1889, two-thirds of the adult male Indians of the White Earth Reservation agreed with the Rice Commission to accept their individual allotments in accordance with the Nelson Act.[13] The parties have stipulated that 95 percent of the remaining 796,672 acres of reservation was eventually allotted to individual Indians.

■ It is well settled that simply opening up a reservation to white settlement does not terminate its status as a reservation. *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300, 314 (1975). Rather, disestablishment of an Indian reservation requires a clear congressional intent to that effect. *State v. Forge, supra; Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court, supra; Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). In *State v. Forge, supra*, we recently held that this congressional intent to terminate is lacking from the Nelson Act. 262 N.W.2d 346.

In *Forge*, it was argued that the Nelson Act had disestablished the Leech Lake Indian Reservation. We rejected that contention by reasoning that Congress had not clearly manifested an intention to disestablish the Leech Lake Reservation and, accordingly, in the absence of such an express statement of congressional intent the issue must be resolved in favor of the Indians. As we stated:

"Although the disestablishment effect of the Nelson Act is not free from doubt, we are convinced after a review of the voluminous authorities cited to us that the act did not terminate the Leech Lake Reservation.

\* \* \* \* \* \*

" * * * to the extent the Nelson Act is unclear in expressing congressional intent to terminate the Leech Lake Reservation, this ambiguity should not be resolved to the prejudice of the Indians. As has been repeatedly recognized by the United States Supreme Court, 'statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138, 141 (1918). Accord, *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). This canon of construction is reflective of the fact that treaties and statutes are 'not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted.' *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089, 1092 (1905). Had Congress intended to terminate completely the Leech Lake Reservation and the right of the Chippewa to fish thereon, we believe that it could have, and would have, expressed this intention with more definiteness and, in all likelihood, would not have permitted the Band, by § 3 of the Nelson Act, to continue to settle within the boundaries of the reservation." 262 N.W.2d 346 (footnotes omitted).

Similarly, in his opinion in *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F.Supp. 1001, 1004 (D.Minn.1971), Judge Devitt persuasively reasoned that:

"It is apparent in light of events before and after the passage of the Nelson Act that its purpose was not to terminate the [Leech Lake] reservation or end federal responsibility for the Indian but rather to permit the sale of certain of his lands to homesteaders and others. The United

13. Also pursuant to the Nelson Act, the Indians ceded outright four townships containing valuable pine preserves to the United States. Our decision in this case applies only to land lying within the 32 townships of the White Earth Indian Reservation remaining after the 1889 cession. The other four indicated townships are therefore not significant to this decision.

States Supreme Court has held that it is the termination of federal responsibility and not the passing of legal land titles within an area which determines whether a reservation exists in the eyes of the law. *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)."

■ The conclusions reached in *State v. Forge, supra,* and *Leech Lake Band of Chippewa Indians v. Herbst, supra,* apply with even greater force to the disestablishment claim raised in this case. By its terms, the Nelson Act provided that the Indians were to move from Leech Lake and other reservations to the White Earth Reservation. If this act did not terminate the reservation from which the Indians were to be removed then, *a fortiori,* it did not terminate the reservation they moved to. Indeed, the fact that Congress continued to pass statutes dealing directly with the White Earth Reservation indicates that it did not intend for it to be terminated by the Nelson Act. See, *Leech Lake Band of Chippewa Indians v. Herbst, supra.* Moreover, the record shows that the Rice Commission and the Indians entered into some discussions incident to the implementation of the Nelson Act which indicate that neither of these parties believed that the act would have the effect of disestablishing the White Earth Reservation.[14] Based on the foregoing, we conclude that the Nelson Act did not disestablish the White Earth Reservation and that, consequently, all lands within its exterior boundaries are "Indian country" as defined by 18 U.S.C.A. § 1151.

The state's contentions do not require a different conclusion. The state, as well as amici, strenuously argues that this court's holding in *State v. Forge, supra,* and the decision of the Federal district court in *Leech Lake Band of Chippewa Indians v. Herbst, supra,* have been undermined by the principles announced by the United States Supreme Court in *Rosebud Sioux Tribe v. Kneip, supra,* and *DeCoteau v. District County Court, supra.* *Rosebud* and *DeCoteau* are the most recent of four Supreme Court opinions beginning with *Seymour v. Superintendent, supra,* and *Mattz v. Arnett, supra,* dealing with the issue of disestablishment of an Indian reservation. Contrary to the state's contention, all four cases are consistent in their approach to the disestablishment question. Each of the four decisions agrees that the standard to be applied in resolving the disestablishment issue is whether a clear congressional intent to terminate the reservation is discernible either from the face of the act, the surrounding circumstances, or the act's legislative history. *Rosebud Sioux Tribe v. Kneip, supra,* 430 U.S. 587, 97 S.Ct. 1363, 51 L.Ed.2d 665; *DeCoteau v. District County Court, supra,* 420 U.S. 444, 95 S.Ct. 1093, 43 L.Ed.2d 314; *Mattz v. Arnett, supra,* 412 U.S. 505, 93 S.Ct. 2258, 37 L.Ed.2d 106; *Seymour v. Superintendent, supra,* 368 U.S. 355, 82 S.Ct. 427, 7 L.Ed.2d 349. In accordance with these cases, this is precisely the standard we applied to the disestablishment claim in *State v. Forge, supra.* Further, to the extent that the state relies upon *DeCoteau,* it should be pointed out that *DeCoteau* was decided some two years prior to this court's decision in *State v. Forge, supra,* was briefed by the parties there, and although not cited therein, was of course considered by the court in its resolution of the disestablishment question.

In any event, we cannot agree with the state that *DeCoteau* is indistinguishable

14. For instance, during the Sixth Council at White Earth, one of the Indians, Gustave Beaulieu, asked the Rice Commission, " * * * whether this reservation will remain intact, or whether this bill provides for the opening of any part of this reservation." Speaking for the commission, Mr. Rice responded that: "Now, should your present reservation be reduced; should some townships be taken off, that land will have the same status as the land just ceded at Red Lake. We are distinctly of the opinion that for your own safety and protection you should part with a small portion of this reservation. Power is given us under the act to reduce it if we see fit, but we are not going to exercise any power that would be injurious to you." H.Exec.Doc.No.247, 51st Cong., 1st Sess. (1890) (the "Rice Report"), at 96.

and controlling here. In *DeCoteau*, the Supreme Court concluded that South Dakota's Lake Traverse Reservation was disestablished by an 1891 act which ratified an agreement reached with the Sisseton-Wahpeton Indians in 1889, wherein they agreed to cede all unallotted lands on the reservation to the United States for a sum certain. The most significant distinction between *DeCoteau* and the present case lies in the differing understandings of the Lake Traverse and the White Earth Indians. In *DeCoteau*, the Court cited a newspaper account of the 1889 negotiations reporting that the Sisseton-Wahpeton Indians had stated, " 'We never thought to keep this reservation for our lifetime.' " 420 U.S. 433, 95 S.Ct. 1087, 43 L.Ed.2d 307. In sharp contrast, the defendants here have persuasively shown that the White Earth Indians desired to keep the reservation intact and understood that it would remain so except for the four townships of pine preserves ceded outright to the United States.[15] Accordingly, we believe that the two cases are markedly different from one another and thus the DeCoteau holding is not controlling in this case.

We therefore adhere to our holding in *State v. Forge, supra,* and necessarily conclude that the Nelson Act did not disestablish the White Earth Indian Reservation. Consequently, we hold that the various violations involved here, although occurring on non-Indian-owned land, nevertheless were committed within "Indian country" and thus the state's jurisdiction is limited to that specifically granted to it by Public Law 280.

As mentioned above, Public Law 280 expressly provided that the state's jurisdiction within "Indian country" did not extend to " * * * deprive any Indian or any Indian tribe, band or community of any right, privilege or immunity afforded under Federal Treaty agreement, or statute with respect to hunting, trapping or fishing or the control, licensing or regulation thereof." 18 U.S.C.A. § 1162(b). The state argues that this exception does not apply because the Indians have no hunting or fishing rights afforded by treaty or statute in the land within the White Earth Reservation. We are unpersuaded by this claim.

Although the Treaty of 1855 extinguished the Indians' aboriginal hunting or fishing rights in the area in question,[16] see, *United States v. Minnesota*, 466 F.Supp. 1382, 1385 (D.Minn.1979), these rights were reacquired by the Treaties of 1864 [17] and 1867 [18] and have never since been extinguished. By the Treaty of 1864, the Mississippi, Pillager, and Lake Winnibigoshish Bands of Chippewa ceded to the United States six reservations reserved to them under the Treaty of 1855, see, n. 16, *supra*. In return they were granted a reservation, to be used as their "future home," located in the area of the present White Earth Reservation, but vastly exceeding its present size. Pursuant to the Treaty of 1867, the Chippewa ceded to the United States most of the land reserved to them by the Treaty of 1864, and in return received the White Earth Reservation.

The Treaty of 1867 specifically referred to agricultural pursuits but made no ex-

---

15. See, e. g., n. 14, *supra*.

16. By the Treaty of 1855, 10 Stat. 1165, see II Kappler, p. 685, the Chippewa agreed to " * * * cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, * * *." In return, they were granted a number of reservations, none of which included any part of the present White Earth Reservation. As recognized by Judge Devitt in *United States v. Minnesota, supra,* this language of cession abrogates all aboriginal hunting and fishing rights.

Nor have the Chippewa advanced a claim that they were orally promised continued hunting and fishing rights in the ceded area. See, *United States v. Minnesota, supra.* Thus, we necessarily conclude that the 1855 treaty extinguished their aboriginal hunting and fishing rights in the area in question.

17. 13 Stat. 693, see, II Kappler, p. 862.

18. 16 Stat. 719, see, II Kappler, p. 974.

press reference to hunting and fishing rights. However, it is clear from the record that hunting and fishing were an important part of the Chippewa's lifestyle and that the need to pursue these activities was a significant consideration in motivating them to negotiate with the government during this period of time.[19] Moreover, the record reflects that for a considerable period after 1867 the White Earth Indians relied, in large part, upon hunting and fishing for their basic sustenance. Thus, undoubtedly the Indians interpreted the 1867 treaty as granting them hunting and fishing rights within the White Earth Reservation and conducted themselves accordingly. Consistent with the fundamental rule that treaties are to be interpreted as the Indians understood them, e. g., *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* —— U.S. ——, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), we are persuaded that, pursuant to the treaties of 1864 and 1867, the Chippewa reacquired hunting and fishing rights in the area in question.

But more important, even absent such a clear showing of the Indians' understanding, we believe that they have such rights because hunting and fishing are a basic incident of reservation status. See, *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *United States v. White,*

508 F.2d 453 (8 Cir. 1974); *Kimball v. Callahan,* 493 F.2d 564 (9 Cir. 1974), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1975). Certainly, it would be incongruous to construe the treaty as denying the Indians their very means of existence while purporting to grant them a home. Accordingly, we hold that the defendants have hunting and fishing rights afforded by treaty within the area in question.

We note that, even though we hold that the state is without jurisdiction to regulate defendants' hunting and fishing activities within the White Earth Reservation, their activities will not go unregulated. Like the Leech Lake Band, the White Earth Indians have adopted a comprehensive conservation code to regulate Indian hunting and fishing within the reservation. This code declares hunting and fishing seasons, sets limits, regulates the use of firearms and other hunting equipment, and is similar to state fish and game laws in other respects. Had this code been in effect at the time the alleged violations occurred, it would have prohibited at least some, if not all, of these activities.

Affirmed.

Mr. Justice KELLY took no part in the consideration or decision of this case.

TODD, Justice (concurring specially).

I concur in the result as applicable to the State of Minnesota in its sovereign capacity. The relationship of the rights vested in tribal members by this opinion and the

19. Apparently there was little game or fish on the reservations reserved to the Chippewa in 1855, and this, in large part, led them to seek a new reservation. In a letter to the President of the United States which provided the impetus for the negotiation of the Treaty of 1864, Chief Hole-In-The-Day complained that the Indians lacked arable land " * * * to say nothing of game, to which, for many years, we must still look in a greater or less degree for subsistence." Chief Hole-In-The-Day wrote the president that: " * * * all these elements of comfort and content to our people; that is, good land, game, fish, rice, and sugar. Here we have neither, to any considerable extent. True, we may find a little rice and a few fish, but not sufficient for my people, not enough to save them from starvation. If a treaty were made with the Red Lake Indians, a tract of country of the best character for my people might be procured, without any outlay or expense to the government; say that strip of land lying on the Wild Rice river, between the 47° and 48° north latitude, and east of the Red river. There is every advantage of good soil, game, fish, rice, sugar, cranberries, and a healthy climate." Report of the Commissioner of Indian Affairs, October 31, 1863, at 329, 330 (Resp.App. at 3).

rights of private property owners who have titles traceable to patents granted by the United States Government is not presented in this case. I have doubt that such private property rights can be affected where there was no specific grant of hunting and fishing rights in the Treaty of 1867, and thus no notice to persons acquiring title to property now possibly being subject to rights vested by this opinion.

YETKA, Justice (concurring specially).

I join in the special concurrence of Mr. Justice Todd.

PETERSON, Justice (concurring specially).

I join in the opinion of Mr. Justice Todd.

OTIS, Justice (concurring specially).

I join in the concurring opinion of Mr. Justice Todd.