STATE of Minnesota, petitioner,
Appellant,

v.

Everett F. KEEZER and Wallace James
Kier, Respondents.

No. 48590.

Supreme Court of Minnesota.

Feb. 29, 1980.

Rehearing Denied June 23, 1980.

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., James M. Schoessler, Sp. Asst. Atty. Gen., St. Paul, Robert W. Johnson, County Atty., and Robert H. Scott, Asst. County Atty., Anoka, for appellant.

Smith, Juster-Feikema and Allen H. Gibas, Minneapolis, for respondents.

KELLY, Justice.

On August 30, 1972, Everett F. Keezer and Wallace James Kier, both Chippewa Indians, were cited by a state conservation officer for harvesting wild rice in Neds Lake, Anoka County, Minnesota, without a license.[1] Subsequently, they were tried and convicted in the County Court of Anoka, and fined $25 each.

Defendants appealed to the Tenth Judicial District Court, and their appeal was heard before a three-judge panel. The district court concluded that the defendants could not be required to hold a state license due to their status as Chippewa Indians.[2]

The State of Minnesota appeals the order of the district court.

The defendants as 11/16 Chippewa Indians contend that their aboriginal hunting, fishing, and ricing rights in the Northwest Territory were guaranteed and raised to treaty and reservation right by the 1795 Treaty of Greenville, 7 Stat. 49, and that conflicting Sioux and Chippewa rights in the Neds Lake area, which was a part of the Northwest Territory, were resolved by the 1825 Treaty of Prairie du Chien, 7 Stat. 272. Because treaty rights are not subject to state licensing requirements, *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), defendants conclude that they cannot be required to hold a state license to hunt, fish, or rice on any land which was unceded Indian land in the Northwest Territory in 1795. This would include not only a large part of Minnesota east of the Mississippi, but also Ohio, Indiana, Illinois, Michigan, and Wisconsin. The state argues that the Chippewas did not receive rights to hunt, fish, or rice in the Northwest Territory in general or the Neds Lake area in particular as a result of either treaty, and that any rights the Chippewas might have received were extinguished by later treaties.

There is no evidence that the Chippewa seriously contended, until the time this litigation was commenced, that the state had no jurisdiction over its hunting, fishing and ricing rights in the Neds Lake area. Because we agree with the state's contention that neither the Treaty of Greenville nor the Treaty of Prairie du Chien gave the Chippewas rights in the Neds Lake area, we affirm the trial court and reverse the district court panel.

---

1. Minn.Stat. 98.45, subd. 1, states: " * * * [N]o person may take * * * any aquatic plants without first procuring a license therefor * * * ."

 Minn.Stat. 98.46 establishes fees for all licenses including a license to harvest wild rice.

2. The court mistakenly affirmed the defendants' convictions on a charge of ricing prior to the opening hour. Although defendants had also been cited on that charge, it had been dropped prior to trial.

### I.

The canons of construction of Indian treaties, as established by the United States Supreme Court, recognize that Indians have a dependent status and that the treaties were often of a nonconsensual nature.

The basic canons of construction of Indian treaties include: (1) Ambiguous expressions should be resolved in favor of the involved Indian parties; (2) treaties should be interpreted as the Indians would have interpreted them; and (3) treaties should be liberally interpreted in favor of the Indians while considering the purposes of the treaties. *Antoine v. Washington*, 420 U.S. 194, 197–200, 95 S.Ct. 944, 947–948, 43 L.Ed.2d 129 (1975); *United States v. Winans*, 198 U.S. 371, 380–81, 25 S.Ct. 662, 663–664, 49 L.Ed. 1089 (1905). *See also Sac & Fox Tribe of Mississippi in Iowa v. Licklider*, 576 F.2d 145, 151, n.7 (8th Cir., *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); Note, 39 Mont.L.Rev. 323, 326 (1978). The clear wording of a treaty cannot be ignored, however, in applying these principles. *United States v. Choctaw Nation*, 179 U.S. 494, 532, 21 S.Ct. 149, 164, 45 L.Ed. 291 (1900); *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), *aff'd sub nom. Red Lake Band of Chippewa Indians v. Minnesota*, No. 79–1420, 614 F.2d 1161 (8th Cir. Jan. 31, 1980).

The legal background against which a treaty is interpreted is also important to a determination of the rights it guarantees. In 1974, the United States Supreme Court restated the basis of Indian title:

"It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974).

Thus, treaties with the Indians often had dual purposes; to recognize Indians' rights to occupancy of certain lands and to gain territory for the United States through the Indians' relinquishment of claims to other lands. In connection with the latter purpose treaties often defined the rights the Indians retained in the ceded areas. *See e. g., United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). Cession treaties are therefore conceptualized and construed as a grant from the Indians to the United States and as reserving to the Indians rights not granted. *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). However, in connection with the former purposes the United States, by virtue of its sovereignty, gave treaty recognition to Indian title, sometimes called the Indian right of occupancy. *See Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) at 543, 5 L.Ed. 681 (1823).[3]

---

**3.** In *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), Mr. Chief Justice Marshall noted that the United States adopted the principles of law and concepts of rights and titles of European nations who settled the United States by conquest. He wrote:

"Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

"In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it

The Treaty of Greenville was designed "[t]o put an end to a destructive war, to settle all controversies, and to restore harmony and a friendly intercourse between the * * * United States, and Indian tribes;" 7 Stat. 49, including the Chippewas. The treaty established peace, provided for the return of prisoners, and set a boundary line between the lands of the United States and the lands of the Indian tribes. The signatory tribes ceded certain lands east and south of the boundary to the United States and expressly retained hunting rights in these ceded areas.[4] On its part, the United States relinquished its claims on Indian lands in the Northwest Territory,[5] but did not attempt to define the territories of each particular tribe. Although Neds Lake was part of the area relinquished by the United States, it was part of Sioux, not Chippewa, territory. The treaty was very specific as to the meaning of the relinquishment by the United States:

"Article V

"To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United. States, and against all other white persons who intrude upon the same. And the said Indian tribes again acknowledge themselves to be under the protection of the said United States and no other power whatever." 7 Stat. at 52.

Defendants contend that Article V is ambiguous and interpret it to mean that the United States raised the aboriginal rights of the Indians in the Northwest Territory to reservation rights. In this connection, they argue that Article V raised the status of hunting rights as mere incidents of the rights of occupancy to the status of a separate treaty right of hunting held in common with all tribes in a vast Northwest Territory Reservation.

Article V of the Treaty of Greenville is not ambiguous. It does not involve land cessions by Indians to the United States. Therefore, the rule of construction that cession treaties are construed as a grant from the Indians to the United States and as reserving to the Indians rights not granted is not applicable. Rather it is apparent that Article V is an articulated version and recognition of Indian title, a right of occupancy. Thus, in relinquishing its claims to the immediate possession of the Indian territory, the United States made clear that the Indian tribes could sell their lands only to the United States and that it was not relinquishing its basic sovereign rights to the lands itself.[6] On their part,

according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it. "While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy.

"The history of America, from its discovery to the present day, proves, we think, the universal recognition of these principles." 21 U.S. (8 Wheat.) at 573–74.

4. Treaty of Greenville, Article III and VII, 7 Stat. 50, 52 (1795).

5. Exempted from the relinquishment by the United States were several sites for posts and forts as well as land where the Indian title had already been extinguished. Treaty of Greenville, Article IV, 7 Stat. at 51.

6. Article VI of the Treaty gave further evidence of this: "If any citizen of the United States, or

the Indian tribes gave up any claims they may have had on lands east and south of the boundary line and acknowledged their dependent status, but they gained treaty recognition of their right of occupancy. Hereafter, their right of occupancy could be extinguished only by purchase, not by conquest.[7] Thus, they were free to enjoy their rights of occupancy, "hunting, planting, and dwelling there," or as Mr. Chief Justice Marshall described it, "to use it according to their own discretion." *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) at 574.

Defendants go beyond the meaning of the treaty in claiming the establishment of a reservation encompassing all Indian lands in the Northwest Territory wherein rights, other than occupancy, were to be held in common. Defendants rely on *Minnesota v. Hitchcock*, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902), and *Spalding v. Chandler*, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469 (1896). These cases dealt with lands which were in use as and considered reservations by both the Indians and the United States long before the issue was considered by the United States Supreme Court. In both cases the reservations had a basis in treaty language. In *Spalding*, Indians ceded a portion of their land, but the treaty stated that a part of the land ceded would be set aside as a place of encampment for the Indians. Although the encampment was never specifically laid out in the treaty, a selection of land was later made and it was accepted by the government: "If the reservation was free from objection by the government, it was as effectual as though the particular tract to be used was specifi-

cally designated by boundaries in the treaty itself." 160 U.S. at 404, 16 S.Ct. at 364. In *Hitchcock*, the Indians ceded a portion of their lands, retaining a tract which was specifically referred to in the treaty as a reservation though no actual change in the status of the retained land had occurred. The Court stated: "It is enough that from what has been done there results a certain defined tract appropriated to certain purposes." 185 U.S. at 390, 22 S.Ct. at 657.

The instant case does not involve an actual reservation, the status of which is being challenged. Rather, it is an attempt to create a technical reservation for a limited purpose which has no apparent basis in fact. There is no evidence that either the Indians or the United States considered this land a reservation as was the case in *Spalding* and *Hitchcock*. No language in the treaty suggests that a reservation is intended.

In *United States v. Northern Pacific Ry. Co.*, 311 U.S. 317, 347–9, 61 S.Ct. 264, 278–279, 85 L.Ed. 210 (1940), the court held that two treaties whose purposes were to establish peace between the United States and certain tribes and peace between warring Indian tribes did not establish a reservation by altering the status of the territory. "The fee of all this territory was in the United States, subject to the Indian right of occupancy." *Id.* at 348, 61 S.Ct. at 278. The court noted that the treaties: " * * * [D]id not set aside a defined territory for the exclusive use of a tribe nor contain the usual provisions for an Indian Agent for schools, assistance in farming operations, etc. The country described in the Treaty of 1851 amounts to one hundred and sixty-

---

7. "The United States, then, have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold, and assert in themselves, the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest; and gave also a right to such a degree of sovereignty, as the circumstances of the people would allow them to exercise." *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) at 587.

any other white person or persons, shall presume to settle upon the lands now relinquished by the United States, such citizen or other person shall be out of the protection of the United States; and the Indian tribe, on whose land the settlement shall be made, may drive off the settler, or punish him in such manner as they shall think fit; and because such settlements made without the consent of the United States, will be injurious to them as well as to the Indians, the United States shall be at liberty to break them up, and remove and punish the settlers as they shall think proper, and so effect that protection of the Indian lands herein before stipulated." 7 Stat. at 52.

three million acres, and that described in the Treaty of 1855 to thirty-seven million acres. In the case of one of the tribes, if the treaty were considered to create a technical reservation it would have allotted to each man, woman, and child in the tribe more than eighteen square miles." *Id.* at 349, 61 S.Ct. at 279. In such circumstances we cannot consider *Spalding* and *Hitchcock* applicable.

Article V of the Treaty of Greenville did not create a vast Northwest territory reservation. Instead it granted treaty recognition of the Indians' right of occupancy. *Williams v. City of Chicago,* 242 U.S. 434, 437, 37 S.Ct. 142, 143, 61 L.Ed. 414 (1917). Furthermore, it described, rather than altered, the basic nature of those rights. There is no indication that any retained rights of the Indians were to be held in common. Article V specifically states that "[t]he Indian tribes *who have a right to those lands,* are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please." (Emphasis added.) This language neither abrogates nor extends any Indian rights in relation to other tribes. No language in the treaty specifically supports defendants' contention, and no rule of construction need be applied to reach such a conclusion. Thus, we conclude that the Treaty of Greenville did not expand Chippewa rights to hunt, fish, and rice to cover all the Indian lands of the Northwest Territory.

### III.

In 1825, the United States negotiated the Treaty of Prairie du Chien between several tribes of the Northwest Territory, including the Chippewa and the Sioux. The Sioux controlled the Neds Lake area. The treaty related the history of warfare between the signatory tribes and states as its purpose "to promote peace among these tribes, and to establish boundaries among them and the other tribes who live in their vicinity, and thereby to remove all causes of future difficulty * * *." 7 Stat. 272. Defendants claim a right to hunt, fish and forage in the Neds Lake area based on Article 13 of the treaty. Article 13 provides:

."It is understood by all the tribes, parties hereto, that no tribe shall hunt within the acknowledged limits of any other without their assent, but it being the sole object of this arrangement to perpetuate a peace among them, and amicable relations being now restored, the Chiefs of all the tribes have expressed a determination, cheerfully to allow a reciprocal right of hunting on the lands of one another, permission being first asked and obtained, as before provided for." 7 Stat. at 275.

Defendants contend that hunting, fishing and foraging rights, recognized in the Treaty of Greenville, were confirmed in the Treaty of Prairie du Chien. They argue that permission to hunt was asked for and given during the treaty's negotiation and that Article 13 confirms the agreement between the Sioux and Chippewa to exchange reciprocal hunting rights. Therefore, as members of the Chippewa tribe, defendants claim a right to hunt, fish and forage in the Neds Lake area.

We have already concluded that the Treaty of Greenville confirmed the signatory tribes' rights of occupancy and did not elevate the status of hunting rights to the status of intertribal communal rights over a vast Northwest Territory. Since the Chippewa did not control the Neds Lake area in 1795, the Treaty of Greenville did not give them any additional rights to that area. Therefore, we consider only whether the Treaty of Prairie du Chien gave the Chippewa any rights in the Neds Lake area which they still possess today.

The defendants suggest that Article 13 of the treaty itself indicates that the signatory tribes thereafter had mutual hunting rights on each other's territory. As we read Article 13, it does not memorialize a continuing reciprocal hunting right but only indicates that permission, being first asked, will be freely given in order to perpetuate the peace established in the treaty. Both the state and the defendants admit the warfare continued between the Sioux and Chippewa. Extended warfare between

the tribes is not consistent with an exchange of reciprocal hunting rights. Apparently the Sioux and Chippewa living in the areas in question subsequent to the negotiation of the treaty did not place upon the treaty the construction urged by defendants. The interpretation urged by defendants is not consistent with the treaty's primary purposes of establishing boundaries between the tribes and it is not required by the canons of construction. The Treaty of Prairie du Chien was not a treaty in which the signatory tribes ceded territory to the United States. Instead the United States was a party to the treaty only in the sense that it negotiated its terms with the signatory tribes and bound itself to use its good offices to remove any difficulties, "[s]hould any causes of difficulty hereafter unhappily arise between any of the tribes * * *." Article 14, 7 Stat. at 275. Therefore, even if Article 13 of the treaty were construed as ambiguous, the rule of construction that ambiguous expressions in treaties should be resolved in favor of the Indians is not applicable in this case.

Even if the Treaty of Prairie du Chien were construed to grant defendants hunting rights in the Neds Lake area, these rights were extinguished by later treaties with the Sioux and Chippewa. Defendants admit that the Sioux right of occupancy in the Neds Lake area was extinguished in the Sioux Treaty of 1837, 7 Stat. 538, and that the Chippewa right of occupancy in Minnesota, except for reservation land, was extinguished in the Treaty of 1855. 10 Stat. 1165. However, they argue that the relinquishment of real property interests is not

the relinquishment of hunting, fishing and foraging rights. They maintain that unless hunting rights are expressly granted in a cession treaty, they are retained. Defendants cite *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968) and *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975).

In *Winans* the treaty expressly reserved to the tribe the right of taking fish at their usual and accustomed places in common with the citizens of the territory.[8] In *Menominee Tribe* the court held that a treaty establishing a reservation "to be held as Indian lands are held," 391 U.S. at 406, 88 S.Ct. at 1707, implied a right to hunt and fish on the reservation and that the Termination Act of 1954 did not disestablish the reservation established by treaty in 1854. Finally, *Antoine* held that hunting rights in ceded territories expressly guaranteed by treaty were not subsequently extinguished by later treaties. These cases are not controlling. *Winans* and *Antoine* involved an express reservation of hunting and fishing rights in a treaty. *Menominee Tribe* involved hunting and fishing rights on a reservation. The Sioux did not expressly retain hunting, fishing or foraging rights in the Neds Lake area when they ceded Indian title in the Sioux Treaty of 1837. 7 Stat. 538. As stated by the court in *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), *aff'd sub nom. Red Lake Band of Chippewa Indians v. Minnesota*, No. 79–1420, 614 F.2d 1161 (8th Cir. Jan. 31, 1980),[9] "If the cessions extinguished Indian

---

8. The dissent cites *Winans* for the proposition that "a treaty is not a relinquishment of rights to Indians, but instead is a grant from the Indians and reserves to the Indians rights not *expressly* granted." (Emphasis added and deleted.) However, *Winans* merely held that cession treaties reserve to the Indians rights not granted. 198 U.S. at 381, 25 S.Ct. at 664. We agree with this obviously correct statement of the law. We contend that the language of the treaties we are concerned with did grant all Indian rights to the United States. Furthermore, *Winans* involved an *express* treaty reservation of fishing rights. In contrast, the dissent attempts to *imply* hunting rights from the

treaties involved in this case. *Winans* is not applicable to this case where by treaties the Indians agreed to grant, cede, relinquish and convey to the United States all their right, title and interest to the lands in question.

9. We recently adopted this reasoning in *State v. Clark*, 282 N.W.2d 902 (Minn.1979), *petition for cert. denied*, —— U.S. ——, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980). We held that the Treaty of 1855 with the Chippewa extinguished hunting rights within the boundaries of the White Earth Reservation but that subsequent treaties establishing the reservation reestablished those rights on reservation land. *Clark* is therefore

title to the ceded areas, they also would have the effect of abrogating any aboriginal hunting, fishing, trapping or wild ricing rights. These rights are mere incidents of Indian title, not rights separate from Indian title, and consequently if Indian title is extinguished so also would these aboriginal rights be extinguished." 466 F.Supp. at 1385. The Sioux could only give the Chippewa hunting rights which were dependent upon their occupancy of the land. Thus, if the Treaty of Prairie du Chien ever granted the Chippewa rights in the Neds Lake area, they were extinguished by virtue of the Treaty of 1837.

 Defendants argue that even if the Sioux lost their rights to hunt, fish and rice in the Neds Lake area, the Chippewa retained them by virtue of the Chippewa Treaty of 1837 in which the Chippewa ceded certain lands to the United States and retained "[t]he privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes *included in the territory ceded, * * * during the pleasure of the President of the United States.*" (Emphasis added.) Article 5, 7 Stat. at 537. This argument, too, must fail. The area ceded in the treaty did not include the Neds Lake area. The Chippewa retained the right to hunt, fish and rice only in the territory ceded. Furthermore, this right was expressly revoked by Order of President Zachary Taylor in 1850. Finally, in 1855 the Chippewa relinquished and conveyed to the United States "any and all right, title, and interest, of whatsoever nature the same may be, which they may now have in, and to any other lands in the Territory of Minnesota or elsewhere." Article 1, 10 Stat. 1166. In *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), aff'd sub nom. *Red Lake Band of Chippewa Indians v. Minnesota*, No. 79–1420, 614 F.2d 1161 (8th Cir. Jan. 31, 1980), the court concluded that despite the fact earlier treaties with the Chippewa expressly granted them hunting rights in ceded areas until these areas were settled, a later treaty in which the Chippewa agreed to " 'grant, cede, relinquish, and convey to the United States all our right, title and interest in and to all' " *Id.* at 1384 ceded areas operated as a complete extinguishment of Indian title in those areas. The district court recognized that the United States Supreme Court has noted that "all right, title and interest" language, identical to the language involved in this case, is "precisely suited" for the purpose of eliminating Indian title and conveying to the government the Indians' entire interest in the ceded lands. *See also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 592, 97 S.Ct. 1361, 1366, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court*, 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975).

We know of no cases in which language substantially similar to that in the Treaty of 1855 did not extinguish all incidents of the Indian right of occupancy where the land involved is non-reservation land or where there was no express treaty reservation of hunting, fishing or foraging rights. Thus, even if the Chippewa had hunting rights in the Neds Lake area, these rights were extinguished by virtue of treaties and orders subsequent to the Treaty of Prairie du Chien.[10]

Defendants are therefore subject to state licensing requirements.

not controlling because it dealt with the issue of disestablishment of the White Earth Reservation and the existence of hunting rights thereon.

10. The dissent would have us hold that the Chippewa possess hunting, fishing and ricing rights in the Neds Lake area. Were this the case, we note that the Chippewa would be entitled to exercise these rights on private as well as public property. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). We think the dissent's distinction between implied and express reservations of hunting rights to be a distinction without a difference. Furthermore, without allowing hunting, fishing and ricing rights to be exercised upon private property these "rights" are virtually non-existent. The very fact that patents were granted conveying title to private individuals is an indication that our government did not construe these treaties as reserving hunting, fishing or any other rights to the Indians.

We hereby grant defendants $1,000 for attorneys fees pursuant to Minn.R.Crim. Proc. Rule 29.03.

Reversed.

WAHL, Justice (dissenting).

Today the majority holds that the 1795 Treaty of Greenville granted the Chippewa no common rights to hunt, fish and rice in the Indian lands of the Northwest Territory because by its language it extends to the Indians no rights "in relation to other tribes," and because the Chippewa tribe did not "control the Ned's Lake area." The court holds, further, that the Chippewa enjoy no hunting and fishing rights by virtue of the 1825 Treaty of Prairie du Chien, partly because "[t]he Sioux could only give the Chippewa hunting rights which were dependent upon their occupancy of the land," and, since 1837, the Sioux no longer have a right of occupancy in the Ned's Lake area. Because I believe these conclusions result from culturally-bounded conceptions of property rights, and because I believe the majority has failed to observe the canons of construction which it recognized in Part I of its opinion, I must respectfully dissent.

Article III of the Treaty of Greenville, a peace treaty between the United States and a number of Indian tribes, established a "general boundary line" between the lands of the United States and the lands of the signatory tribes. The United States "relinquished" its claims to Indian lands beyond this line in Article IV of the treaty. The U. S. Supreme Court has, however, made it clear that a treaty is not a relinquishment of rights *to* Indians, but instead is a grant *from* the Indians and reserves to the Indians rights not expressly granted. *United*

*States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); see also *United States v. Washington*, 520 F.2d 676, 684 (9th Cir. 1975), cert. denied 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Cutler*, 37 F.Supp. 724 (D.Idaho 1941). Since *Winans*, in which this principle of construction was first articulated, it has never been limited to land cession provisions, as the majority suggests. Nor is it fair to consider Article V in isolation from the whole of the treaty in which it appears, a treaty in which the signatory Indian tribes "ceded" to the United States that land south and east of the boundary line. Thus, we are bound to give effect to the principle that the Treaty of Greenville is a grant *from* the Indians.

In light of this principle, it is difficult to imagine that by the language of Article V of the treaty—"The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, * * "—each Indian tribe intended to bind itself to "hunting, planting, and dwelling" on particular tracts of land which are not even identified in the treaty. Such an intention would be utterly contrary to Indian notions of hunting and fishing and ricing rights as arising from ancient tribal economic custom and practice, not, as under Anglo-American real property concepts, as incidents of title or ownership.

As the majority opinion recognizes, the Treaty of Greenville established a boundary line separating Indian land from land claimed by the United States, but it did not divide the Indian land among the individual tribes.[1] No inter-tribal boundaries were

1. Although the majority recognizes that the Treaty of Greenville did not establish boundaries among the Indian tribes themselves, it nevertheless observes that the Ned's Lake area was "part of Sioux, not Chippewa, territory." In *Miami Tribe v. United States*, 175 F.Supp. 926, 146 Ct.Cl. 421 (1959), the United States Court of Claims described the history of the 1795 treaty and stated:

In 1794, in pursuance of the policy expressed in the above quoted provision of the Northwest Ordinance, General Anthony

Wayne was appointed a commissioner to negotiate a treaty with the hostile tribes of the Northwest Territory. In his treaty instructions it was emphasized that he should attempt to bring about an agreement concerning a dividing boundary line between lands used and occupied by the Indian tribes in the territory and the lands which belonged to the United States. He was also instructed to establish the boundry [sic] lines between the lands owned by the separate tribes in the territory. He was authorized to guarantee to

defined until later—in the case of the Chippewa, not until the 1825 Treaty of Prairie du Chien. Moreover, even if such boundaries had been established in 1795, there is no clear indication that they would limit the rights of the individual tribes to hunt and fish and rice on land "belonging" to their neighbors. Indeed, it seems highly unlikely that the individual tribes would have been willing to impose such a limitation with respect to Indian land by this treaty, which in Article VII provides: "The said tribes of Indians, parties to this treaty, shall be at liberty to hunt within the territory and lands which they have now ceded to the United States * * *."

The majority places great emphasis on the fact that the Treaty of Greenville did not establish a "reservation" having the same technical characteristics of reservations established in other treaties, but merely granted recognition of the Indians' "right of occupancy." Regardless of whether the Indians themselves considered the Northwest Territory a reservation, however, it is clear they considered the land theirs. Government lawyers, who drafted the treaties, could declare "fee title" in the United States, impose it against the Indians, who were unlettered and innocent of Anglo-American concepts of law, and call their rightful claim a "right of occupancy." This formalistic characterization of the Indians' rights, and the conclusion that the treaty could not have contemplated common hunting and ricing rights because those rights would intrude on the individual tribes' occupancy rights, reflect western notions of territoriality and exclusivity of property ownership, a tradition in which the concept of communal use of land is quite foreign. To insist that the treaty must be interpreted to square with these concepts is to ignore the principle of interpretation that "[t]he extent of [the grant of land from the Indians] will be construed as understood by the Indians at that time, * * *." *United States v. Washington,* 520 F.2d at 684.[2]

I would hold that the rights involved in this matter—the rights of the Chippewa Indians to hunt, fish, and harvest wild rice, originally aboriginal rights—ripened into treaty rights when the Treaty of 1795 expressly recognized and guaranteed them. Articles V and VII of the Greenville Treaty expressly recognized and sanctioned these rights both with respect to the land areas explicitly ceded by the signatory tribes to the United States and with respect to the land areas expressly "relinquished" by the United States to the Indians.

These treaty rights to hunt, fish, and gather rice on Indian land were held in common by the Indian tribes, as recognized in the 1825 Treaty of Prairie du Chien. The 1825 Treaty established boundaries within the Indian lands between the signatory tribes and provided, in Article 13: "[T]he Chiefs of all the tribes have expressed a determination, cheerfully to allow a reciprocal right of hunting on the lands of one another, permission being first asked and obtained, as before provided for." The majority opinion finds no establishment of reciprocal hunting rights in these words "[a]s we read [them]," but the language is at

the Indian tribes the right to the soil in the lands owned by them as against any citizens or inhabitant of the United States. *During the course of the negotiations with the Wyandots, Delawares, Shawnees, Ottawas, Chippewas, Pottawatamies, Miamis, Eel River, Weas, Kickapoos, Piankishaws and the Kaskakias, it became apparent that it would not at that time be possible to persuade the tribes to agree to definite boundaries between their separate areas of occupation and accordingly his treaty instructions were altered to permit him to make a single treaty with all of the tribes establishing the overall* boundaries of the *land owned by all of them without defining inter-tribal boundaries.* (Emphasis added.)
175 F.Supp. at 930. *The Miami Tribe* court concluded, further, contrary to the majority's holding here, that the Treaty of Greenville "acknowledged in the Indians the right to *permanently* occupy and use land." 175 F.Supp. 936, 937 (Emphasis added.)

2. It should also be noted that the treaties were drawn by government lawyers, while the Indians, ignorant of Anglo-American law, were unrepresented by counsel.

least ambiguous.[3] The opinion states that the presumption in favor of the Indians in the case of such ambiguity need not be exercised here because the real parties to the 1825 treaty were the tribes themselves, with the United States involved only as negotiator. Thus the presumption need not be exercised in favor of one of the signatory tribes against another. The conflict in this case, however, is not between Sioux and Chippewa, but between the State of Minnesota and two Chippewa Indians. The fact that warfare continued between the Sioux and the Chippewa even after the 1825 treaty has no bearing on the question whether reciprocal rights were exchanged at that time. The Journal of Proceedings makes clear that the Indians did understand the 1825 treaty as a peace treaty, but fully expected to go on sharing with each other the fish, game, and wild rice on all tribes' lands. Journal of Proceedings, Treaty of Prairie du Chien, Clark Papers, typeset copies Vols. 2–3, Manuscript Department, Kansas State Historical Society, at 178.

The notion expressed in the majority opinion that rights to hunt and fish are exclusive and cannot be enjoyed simultaneously without conflict reflects the same cultural limitation which is reflected in the conception that rights the Chippewa enjoy *now* can only arise from the Sioux's *present* ownership of the Ned's Lake land, as though hunting and fishing rights were easements and originated in the land rather than in economic practice. Both the state and defendants here recognize in their briefs that the land reserved to the Chippewa by the 1825 treaty was vastly inadequate to support their population. This fact in itself persuades me that the Chippewa could not willingly and voluntarily have signed an agreement which would have left them without sufficient food and game to survive. I would interpret the treaties, as I believe the Indians interpreted them, to acknowledge hunting and fishing and ricing rights as separate from rights of ownership of the land itself, not dependent upon, or incident to, fee title.

I would hold, further, that these hunting and fishing and ricing rights were not relinquished by the treaties of 1837 and 1855 because not explicitly surrendered. Citing *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn.1979), *aff'd sub nom. Red Lake Band of Chippewa Indians v. Minnesota*, No. 79–1420, 614 F.2d 1161 (8th Cir. Jan. 31, 1980), the majority opinion concludes that these treaties, by which the Chippewa ceded all "right, title, and interest" to land in Minnesota, extinguished their "aboriginal rights" to hunt, fish or harvest wild rice on such land. In *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F.Supp. 1001 (D.Minn.1971), however, the district court considered the same language appearing in the Nelson Act, and held that it did not abrogate hunting and fishing rights which "while perhaps in fact dating back many years to an aboriginal right were established in law by treaty * * *. * * * The United States Supreme Court has counseled us that the abrogation of treaty rights is not to be lightly inferred." *Id.* at 1004. It is noteworthy that the *Leech Lake Band* court found that Chippewa hunting and fishing rights were not extinguished by the 1855 treaty, in which the Indians conveyed "all right, title, and interest * * * in, and to *any other lands in the Territory of Minnesota* or elsewhere." Treaty of February 22, 1855, 10 Stat. 1165, Article I. (Emphasis supplied.)

The *United States v. Minnesota* decision relies, again, on the assumption that hunting and fishing rights are mere incidents of Indian title, extinguished once such title is extinguished. The court cited no authority for that proposition; rather, it relied on two recent United States Supreme Court decisions which construed similar treaty language as effecting the disestablishment of a

---

**3.** This ambiguity is demonstrated most plainly by the opinion of the district court appeals panel in this case, which discussed Article 13 and concluded: "A fair construction of Article 13 indicates a reciprocal right to hunt was granted at the time of the signing of the treaty."

specific Indian reservation.[4] However, in *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Supreme Court considered statutory language which unequivocally terminated a reservation, and held that it did not abrogate hunting and fishing rights. *See Leech Lake Band of Chippewa Indians v. Herbst*, 334 F.Supp. at 1005. I would hold the *Menominee Tribe* decision controlling here: the hunting and fishing rights recognized in the treaty of 1795 and reciprocally exchanged between Sioux and Chippewa in the treaty of 1825 have never been expressly extinguished, and cannot be said to have been terminated by implication.

I would affirm the well-reasoned decision of the district court appeals panel and would hold that while the state may regulate the exercise of the Chippewa Indians' right to harvest wild rice to the extent reasonable and necessary to conserve the state's wild rice resources, *Tulee v. Washington*, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), the state may not require them to purchase a license. To affirm the decision of the district court is not to hold that Chippewa Indians may hunt, fish or rice wherever they choose. The relationship of the rights vested in tribal members by the appeals panel decision and the rights of private property owners who have titles traceable to patents granted by the United States government is not presented in this case. As Mr. Justice Todd noted in his concurring opinion in *Minnesota v. Clark*, 282 N.W.2d at 909, it is doubtful that such private property rights can be affected where there was no specific grant or abrogation of hunting, fishing and ricing rights in the treaties construed, and thus no notice to persons acquiring title to property now

possibly subject to rights vested by affirmance of the appeals panel decision. Other cases in which Indians' hunting and fishing rights were held to survive the claims of private owners involved treaties which expressly guaranteed to the Indians the right to hunt and fish on non-Indian land "in common with [all] citizens of the Territory." *United States v. Winans*, 198 U.S. 371, 379, 25 S.Ct. 662, 663, 49 L.Ed. 1089 (1905); *Puyallup Tribe v. Dep't of Game*, 391 U.S. 392, 395, 88 S.Ct. 1725, 1726, 20 L.Ed.2d 689 (1968); *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). Thus, private owners having title traceable back to the original patent in those cases were on notice of the Indians' claims of hunting, fishing and ricing rights on their land. The most we would hold by affirmance is that in areas governed by the circumstances presented here, where individuals generally may hunt, fish or rice and the public water of Ned's Lake is one such place, Chippewa Indians may hunt, fish or rice without a license.

OTIS, Justice.

I join in the dissent of Justice WAHL.

4. In *Minnesota v. Clark*, 282 N.W.2d 902 (Minn. 1979), *petition for cert. denied*, —— U.S. ——, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), likewise, we considered language of the Nelson Act and held that it did not disestablish the White Earth Indian Reservation because the Act did not clearly manifest Congressional intent to effect such a disestablishment. *Id.* at 907, 908. We noted there that "the treaty of 1855 extinguished the Indians' *aboriginal* hunting and

fishing rights" (emphasis supplied), but hunting and fishing rights were reacquired in the treaty of 1867, despite the fact that it "made no express reference" to such rights. The record revealed that the White Earth Indians relied on hunting and fishing for their basic sustenance, and "undoubtedly" interpreted the 1867 treaty as granting them hunting and fishing rights within the White Earth Reservation which the treaty established.